IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36501-8-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 37035-6-III) |
| | ) | |
| v. | ) | |
| | ) | |
| DALLAS JOHN PAUL LANGE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| In the Matter of the Personal Restraint of: | ) | |
| | ) | |
| DALLAS JOHN PAUL LANGE, | ) | |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, J. — Dallas Lange appeals his conviction for the crime of

first degree assault while armed with a deadly weapon and aspects of his sentence. We

affirm Mr. Lange's conviction, but remand for additional findings to support the

requirement that he receive a mental health evaluation and for the trial court to strike the

drug evaluation requirement and the criminal filing fee.

FACTS[1]

Dallas Lange swung an axe down on Jerry Billings, fileting his cheek and cutting

deeply into his chest. The State originally charged Lange with attempted first degree

murder and asserted a deadly weapon enhancement. Lange asserted the defenses of self-

defense and diminished capacity. He hired Dr. Stephen Cummings, a licensed

psychologist, to assess whether various factors prevented him from forming the mental

intent to murder or assault Billings.

Dr. Cummings reviewed the various written witness accounts and interviewed

Lange to learn what happened. Lange had been in prison for 10 months by the time of the

interview.

According to Lange, he and his girlfriend, Theresa Pauling, lived in a recreational

vehicle next to a house rented by Billings and Kirsten Pauling, Theresa's mother. Lange

paid rent to Billings, and Billings paid rent to his landlord.

Theresa Pauling went to the trailer and asked her mother to ask Billings for keys to

a car that Lange was purchasing from Billings. Billings, who had received an eviction

---

[1] The only issue that requires a recitation of facts is whether the trial court erred when it granted the State's motion to exclude Dr. Stephen Cummings from testifying. For this reason, our statement of facts comes from the information the trial court considered in its ruling, Dr. Cummings's report, and Officer Leo Lucatero's certified statement of probable cause.

2

notice, refused unless Lange paid him $250. This led to an argument between Lange and Billings. The argument escalated and Lange swung at Billings and missed. Billings, who is much larger than Lange, grabbed him. Lange tried to leave the house and slammed the door on Billings who was following him outside. The two men continued fighting and gouged at each other's eyes. Kirsten Pauling then separated the two men. They went inside, with Billings going into his office, and Lange going into the living room. There were several hunting knives laid out in the kitchen area.

A few minutes later, Billings came out of his office and told Lange and Theresa Pauling they were "'out of here,'" possibly meaning evicted from the mobile home. Clerk's Papers (CP) at 5. Lange responded, "'no, you're out of here,'" and grabbed a large axe that was hanging on the wall next to the wood stove. CP at 5.

Lange described to Dr. Cummings what he was feeling: "'I had a mental breakdown from stress, the money, and sleep deprivation. I wasn't expecting to get attacked. I had tunnel vision and picked up the nearest thing on the wall. A big axe. I took a step forward and swung it.'" CP at 27.

In his report, Dr. Cummings stated that his role was "to explain why Dallas Lange engaged in the actions which resulted in being charged with assault, then attempted murder." CP at 23. Dr. Cummings gave Lange the Millon Clinical Multiaxial Inventory-

IV (MCMI-IV), a psychological test comprised of 195 true-false questions. He noted in his report that the testing algorithm did not account for the fact that Lange had been in prison for 10 months.

Based on interviews with Lange and his mother, and administering the testing algorithm, Dr. Cummings concluded:

> Dallas is[2] experiencing a *severe mental disorder*. He appears to fit the following personality disorders best: Melancholic Disorder, with Avoidant Personality Type; Schizoid Personality Type, and Borderline Personality Style. Furthermore, clinical syndromes suggested by his test profile include: Major Depression, recurrent, severe; Generalized Anxiety Disorder, and Posttraumatic Stress Disorder.

CP at 28.

Based on this diagnosis, Dr. Cummings explained why Lange acted in the manner he did:

> My best professional guess is that Dallas Lange harbored increasing resentment towards Jerry Billings for his deceitfulness and financial exploitation. . . . Thus we have a defining moment in time . . . when he reacted to mounting internal stress and genuine perception of danger to his well being, by securing the nearest potent weapon in order to neutralize the very source of that immediate danger, to wit, Mr. Billings, who weighs 145 kgs. (about 320 pounds). His momentary impulsive decision was surely regrettable but reflected a build-up of deep anger that had been masked via his passive-aggressive demeanor until he snapped.

---

2 The context of the report suggests that the diagnosis relates to Lange's condition at the time of the interview, not at the time of the alleged assault.

. . . Like many fights, this one was verbally provocative and with its escalation and the nearby access to lethal weapons, the likelihood of inflicting physical harm was clearly enhanced. . . . When his very existence seemed to be threatened, he lost control and his actions have accordingly changed the course of his life.

CP at 30-31.

Well before trial, the State moved to amend the charges to include first degree assault. The trial court granted the motion. Also at that time, the State moved to exclude the testimony of Dr. Cummings. The court heard argument, reserved ruling, and days later entered a written ruling explaining its decision to exclude the expert's testimony. We highlight the following aspects of the court's written ruling:

It is not enough that a defendant may be diagnosed as suffering from a particular mental disorder. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime. The opinion concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged.
. . . .
. . . While Dr. Cummings opines that the defendant appears depressed he does not logically and reasonably articulate that the defendant's medical condition precluded the defendant from forming the premeditated "intent" to cause . . . the death of the alleged victim.

CP at 19-20.[3]

_____

[3] The trial court had recently granted the State's motion to amend charges to include first degree assault. However, the order excluding Dr. Cummings discusses only

5

The matter proceeded to trial. After the parties submitted their evidence, the trial court provided the jury with instructions on the law, including the law of self-defense and the standard first aggressor instruction. Lange did not object to the first aggressor instruction.

The jury could not unanimously agree on the charge of attempted first degree murder, but returned a guilty verdict on the charge of first degree assault. It also found that the State had proved the deadly weapon enhancement.

The trial court sentenced Lange to 147 months of confinement and 36 months of community custody. As part of community custody, the trial court ordered Lange to undergo treatment for substance abuse disorder and mental health disorder. The trial court also ordered Lange to pay the criminal filing fee and community custody supervision fees.

Lange timely appealed to this court.

---

the original charge of attempted first degree murder.

ANALYSIS

DUE PROCESS RIGHT TO PRESENT A DEFENSE

Lange contends the trial court violated his constitutional right to present a defense. He argues that Dr. Cummings's testimony was relevant to his diminished capacity defense and his claim of self-defense.

*Constitutional principles*

We review constitutional claims de novo, as questions of law. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). We review a trial court's decisions admitting or excluding evidence for abuse of discretion. *State v. McDonald*, 138 Wn.2d 680, 693, 981 P.2d 443 (1999).

The Fifth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution guarantee that no person shall be "deprived of life, liberty, or property, without due process of law." This right to due process includes the right to be heard and to offer testimony. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). The accused's right to due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). And the right "to call witnesses in one's own behalf [has] long been recognized as essential to due process." *Id.* "Just as

7

an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

A criminal defendant's right to present witnesses has limits. A defendant must "at least make some plausible showing of how [a witness's] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). The defendant's right must yield to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *State v. Finch*, 137 Wn.2d 792, 825, 975 P.2d 967 (1999).

*Evidentiary principles with respect to diminished capacity*

"To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the specific intent to commit the crime charged." *State v. Ellis*, 136 Wn.2d 498, 521, 963 P.2d 843 (1998). "The opinion of an expert concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form

8

the culpable mental state to commit the crime charged." *State v. Atsbeha*, 142 Wn.2d 904, 918, 16 P.3d 626 (2001).

Dr. Cummings's opinions did not meet this standard. In his report, Dr. Cummings sought to explain why Lange assaulted Billings. Dr. Cummings did not conclude that Lange's disorders caused him to be unable to form the intent to assault or kill Billings. Instead, Dr. Cummings concluded that Lange's passive-aggressive personality disorder caused him to react impulsively and snap. A person can react impulsively and snap and still intend to assault or kill someone. Most violent acts occur due to a combination of impulsivity and loss of control.

Lange likens his case to *Ellis*. There, the Supreme Court concluded that the trial court abused its discretion in excluding expert testimony to support a diminished capacity defense. 136 Wn.2d at 523. There, Ellis was charged with premeditated first degree murder of his mother and his two-year-old half sister. *Id.* at 500. One defense expert opined that Ellis suffered from a borderline personality disorder and intermittent explosive disorder. *Id.* at 520. He explained that these disorders underlay Ellis's killings because they related to his "emotional discontrol." *Id.* This expert opined that Ellis was "'an individual whose perceptional process, whose interpreting process, his decision making capacity and his ability to properly regulate his behavior, was severely

9

compromised as a direct result of this ongoing personality disturbance.'" *Id.* The expert

concluded that Ellis's "'continuously disregulated state'" caused him to kill his sister

because the maternal attachment between his mother and young half sister triggered an

"'intense exasperation of an already existing level of emotional discontrol.'" *Id.*

But in *Ellis*, the defense presented an opinion from a second expert that tied

together Ellis's mental disorders with his inability to form the requisite intent. The

second expert opined that Ellis suffered from an antisocial personality disorder and

impulse control disorder. When asked how Ellis's mental disorders causally connected

the lack of intent, this second expert testified:

> "[W]hen he went over three in that situation with his mother, he walked in
> there with this history of problems, this history of mental disorder. . . . He
> is in a situation where certain stressors arise. And given the weaknesses in
> his psychological makeup, the mind is overpowered basically by—there is a
> breakdown in the deliberation process, in forming judgments and decisions,
> and the person ends up acting from disarray and from confusion and
> emotional forces, rather than from a deliberate forming of intent. . . ."

*Id.* at 520-21 (alterations in original).

We distinguish *Ellis*. There, expert testimony demonstrated that mental disorders

impaired the defendant's ability to form the specific intent to commit the crime charged.

Here, nothing in Dr. Cummings's report demonstrated that Lange's mental disorders

impaired his ability to form the intent to assault or kill Billings.

*Evidentiary principles with respect to self-defense*

Lange also argues that Dr. Cummings's testimony was erroneously excluded because it was relevant to self-defense. Lange argued to the trial court: "At a minimum, even if they don't find that there is diminished capacity, it is relevant mental state evidence that the jury should be able to use given Dr. Cummings' background and his examination of Mr. Lange." Report of Proceedings (RP) at 26. On this point, we do not believe the trial court abused its discretion.

Evidence of self-defense "must be assessed from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees." *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). This approach incorporates both subjective and objective components. *Id.* It is subjective in that the jury is entitled to stand as nearly as practicable in the shoes of the defendant and from this point of view determine the character of the act. *Id.* It is also subjective in that the jury is to consider the defendant's actions in light of all the facts and circumstances known to the defendant. *Id.* The defendant must subjectively believe in good faith that he was in imminent danger of being injured. *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002). The evaluation is objective in determining what a reasonably prudent person similarly situated would have done. *Janes*, 121 Wn.2d at 238.

Excluding Dr. Cummings's testimony had no effect on Lange's own ability to testify about his subjective point of view. Lange was able to and did testify what he knew about Billings. Lange testified that Billings is a very aggressive person who does not stop fighting, and he feared for his life when Billings entered the kitchen and so many lethal weapons were nearby.

We acknowledge that expert testimony, if relevant, should be allowed to support a claim of self-defense. *See State v. Kelly*, 102 Wn.2d 188, 196 n.2, 685 P.2d 564 (1984) (Evidence of battered woman syndrome is admissible to show subjective state of mind to support self-defense.). Here, Dr. Cummings would have testified that (1) Lange had pent up anger toward Billings, lost control of his anger, and (2) took the axe off the wall because he genuinely perceived a threat to his existence. The first portion of the opinion ties Lange's passive-aggressive disorder to his loss of control. But loss of control is not relevant and is even antithetical to self-defense. The second portion of the opinion does not tie any of Lange's various mental disorders to why he possibly overreacted. We conclude that Dr. Cummings's testimony was not relevant to Lange's self-defense claim, and the trial court did not abuse its discretion when excluding that testimony.

FIRST AGGRESSOR INSTRUCTION

Lange contends the trial court erred by giving the jury a first aggressor instruction. He argues the instruction allowed the jury to surmise that words alone constituted a provocation that disqualified his defense of self-defense. But Lange did not object to the first aggressor instruction at trial.

This court typically does not review issues that were not first raised in the trial court. RAP 2.5(a). One of the exceptions to this rule is where the alleged error is a manifest error of constitutional magnitude. RAP 2.5(a)(3). In *State v. Grott*, 195 Wn.2d 256, 458 P.3d 750 (2020), our Supreme Court recently addressed manifest constitutional error in the context of a court giving a first aggressor instruction.

### *Claim of constitutional error*

In *Grott*, the court recognized that jury instructional errors that relieve the State of its burden of proof qualify as constitutional errors. *Id.* at 268. The court clarified that "first aggressor instructions are used to explain to the jury one way in which the State may *meet* its burden: by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense." *Id.* And for this reason, the giving of a first aggressor instruction does not necessarily relieve the State of its burden of proof. *Id.* at 268-69.

Lange argues the error he claims is one of constitutional magnitude because an inaccurate first aggressor instruction is tethered to a self-defense claim. He argues the instruction given failed to adequately inform the jury that words alone are insufficient provocation for purposes of the first aggressor instruction and thus relieved the State of its burden to disprove self-defense. We agree that such a claim of error is of constitutional magnitude.

### *Manifest error*

Lange must also establish that the claimed constitutional error is manifest. "Manifest error" requires a plausible showing by the appellant that the asserted error had practical and identifiable consequences in the trial of the case. *Id.* at 269.

Lange argues the error is manifest because the jury was *permitted* to find that the State disproved his self-defense claim on the erroneous basis that he verbally provoked Billings. Lange fails to persuade us that this theoretical error plausibly occurred.

Nowhere during closing argument did the State suggest that Lange's self-defense claim was precluded because of words alone. Rather, the State argued: "And who's the first person who brings violence to it? The defendant. He slams the door in [Billings's] face, then [Lange] punches him." RP at 434. This is not "words alone," but an act of physical aggression.

14

Because Lange cannot plausibly show an identifiable consequence of the alleged

error, any potential error is not manifest.  Therefore, we will not review it.

PROSECUTORIAL MISCONDUCT

Lange contends the prosecutor committed misconduct during closing arguments.

He argues the prosecutor misstated the law for the first aggressor standard and for the

self-defense standard.  We disagree.

When reviewing an allegation of prosecutorial misconduct, this court looks at the

prosecutor's statements, within the context of the entire case, to determine whether the

conduct was both improper and prejudicial.  *State v. Thorgerson*, 172 Wn.2d 438, 442,

258 P.3d 43 (2011).  Where a defendant has not objected to the statements, he waives the

error unless he can show the statement is so flagrant and ill intentioned that it caused

enduring prejudice that could not be neutralized by an admonition to the jury.  *Id.* at 443.

We have already discussed Lange's first argument above.  Unlike how Lange

characterizes the State's closing argument, the prosecutor did not argue that Lange was

the first aggressor because of his words or threats.  He stated plainly to the jury that

Lange was the first aggressor because of the physical attacks he made on Billings.  This is

well within the proper argument for a first aggressor instruction.

15

Lange further argues that the prosecutor misstated the law on the first aggressor instruction by stating Lange created the "situation" where he would need to act in self-defense as opposed to provoking the necessity to act in self-defense. He argues creating the "situation" involves scenarios where the defendant did or said something that provoked the complaining witness, but would not qualify as legal provocation. Again, within the context of the case as a whole, this was not what the State argued. It argued that the act of slamming the door and hitting Billings was provocation for a fight. We need not look at hypothetical scenarios here. Within the context of the case, the prosecutor's arguments regarding first aggressor were proper.

Finally, Lange contends the prosecutor omitted part of the self-defense standard. He argues the State only gave the jury part of the standard, what a reasonable person would believe is necessary to defend themselves, and ignored the subjective part of the standard, Lange's own perceptions at the time. Again, unlike Lange's characterizations, the prosecutor did not tell the jury to ignore Lange's subjective perception, implicitly or explicitly. In fact, the prosecutor stated in its argument, "It's got to be reasonable to what the perceived threat is, and here there is no threat." RP at 434. The prosecutor did not commit misconduct in his statements.

Lange argues, in the alternative, that his counsel was ineffective for not objecting to the prosecutor's statements. However, since we find there was no misconduct, it cannot be ineffective assistance to have not objected here.

MENTAL HEALTH TREATMENT CUSTODY CONDITION

Lange contends the trial court erred by ordering mental health evaluation and treatment as part of his community custody conditions. He argues the trial court did not make the statutorily required findings. The State correctly concedes this issue and we agree.

The trial court is empowered to order mental health evaluations and treatment only when the court has made a finding "that reasonable grounds exist to believe that the offender is a mentally ill person as defined in RCW 71.24.025, and that this condition is likely to have influenced the offense." RCW 9.94B.080. The trial court in this case made no such findings. Because the trial court never found Lange mentally ill and never found any mental illness likely influenced his attack of Billings, it abused its discretion in ordering a mental health evaluation and treatment.

The State contends the proper remedy is to remand to allow the trial court to determine whether Lange is mentally ill and, if so, make the proper findings. *State v.*

*Shelton*, 194 Wn. App. 660, 676, 378 P.3d 230 (2016).  We agree and remand to the trial court to make this determination.

DRUG EVALUATION AND TREATMENT CONDITION

Lange contends the trial court erred in ordering an evaluation and treatment for a substance abuse disorder.  Lange argues that there was no evidence that any drug use on his part was reasonably related to his assault on Billings and that it is not crime related. We agree.

The court is authorized to require an offender to "[p]articipate in crime-related treatment or counseling services" and in "rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community."  RCW 9.94A.703(3)(c), (d). However, the trial court may only impose drug abuse treatment where evidence in the record supports the proposition that an offender's drug use was related to the underlying offense.  *State v. Munoz-Rivera*, 190 Wn. App. 870, 892-93, 361 P.3d 182 (2015). Substantial evidence must support this determination.  *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015).

The State contends Dr. Cummings's report shows that Lange regularly smoked "dabs"[4] on a regular basis since his adolescence and had routinely done so just prior to his projected drive to work that day. It further argues that Lange, when asked about concentrated tetrahydrocannabinol, said "'you just don't want to move . . . like a high dose of OxyContin.'" CP at 25. However, nothing about this evidence shows that Lange's habitual drug use led to his assault of Billings.

Because substantial evidence was not presented to support Lange's drug use being crime related, we remand to have the condition struck.

LEGAL FINANCIAL OBLIGATIONS (LFOs)

Lange contends the trial court erred by imposing discretionary LFOs despite finding him indigent. He argues the criminal filing fee and community supervision fees are discretionary and are barred from being imposed.

Engrossed Second Substitute House Bill 1783, 65th Leg., Reg. Sess. (Wash. 2018), which became effective June 7, 2018, prohibits trial courts from imposing discretionary LFOs on defendants who are indigent at the time of sentencing. LAWS OF 2018, ch. 269, § 6(3); *State v. Ramirez*, 191 Wn.2d 732, 738, 747, 426 P.3d 714 (2018). This change to the criminal filing fee statute is now codified in RCW 36.18.020(2)(h). As held

---

[4] CP at 25.

in *Ramirez*, these changes to the criminal filing fee statute apply prospectively to cases pending direct appeal prior to June 7, 2018. *Id.* at 738. Accordingly, the change in law applies to Lange's case. Because Lange is indigent, the criminal filing fee must be struck pursuant to *Ramirez*.

In *State v. Spaulding*, No. 53253-1-II, slip op. at 8-9 (Wash. Ct. App. Nov. 17, 2020), https://www.courts.wa.gov/opinions/pdf/D2%2053253-1-II%20Published% 20Opinion.pdf, Division Two of this court held that a sentencing court is not prohibited by RCW 10.01.160(3) from imposing community supervision fees on an indigent defendant. *Spaulding* recognizes that RCW 10.01.160(3) prohibits discretionary costs from being imposed on an indigent defendant. *Spaulding* then notes that RCW 10.01.160(2) "defines 'cost' as an expense incurred by the State to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision." *Id.* at 9. *Spaulding* correctly concludes that community supervision fees do not qualify as a "cost" under that definition. *Id.*

Nevertheless, RCW 9.94A.703(2)(d) explicitly permits a trial court to waive community custody supervision fees. There is no evidence here the trial court intended to waive such fees. If it declined to waive these fees, it acted within its discretion. But if it

20

overlooked this and desires to waive such fees, it is not foreclosed from doing so on remand.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

SAG I: PROSECUTORIAL MISCONDUCT

Lange contends the prosecutor committed misconduct by misstating the law on self-defense. Because we have addressed this above, we need not readdress it here.

SAG II: CLOSING COURTROOM

Lange contends the trial court erred by denying two members of the public from sitting in on his voir dire. This assertion relies on facts outside the record on appeal, and this court cannot review it. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Affirmed in part; remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Siddoway, J.

21