# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>　　v.<br><br>WILLIAM LEWIS MARION,<br><br>　　　　　　　Appellant. | DIVISION ONE<br><br>No. 79368-3-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — William Marion appeals from his convictions of assault in the first degree and assault in the second degree, both with deadly weapon enhancements.  Marion's primary arguments on appeal are that the trial court erred by (1) giving a first aggressor instruction to the jury, (2) excluding certain evidence regarding the character of the neighborhood where the assaults occurred, and (3) admitting video evidence of his show-up identification.  Marion also advances numerous arguments in his statement of additional grounds.  Because Marion does not establish an entitlement to relief on any of these claims, we affirm his convictions.  However, because a recent decision of our Supreme Court indicates that Marion is entitled to be resentenced, we remand the cause to the superior court for such action.[1]

---

[1] Marion's claim that he must be resentenced was raised for the first time in a motion filed after the filing of our opinion in this matter.  However, because the issue was raised on direct appeal, Marion is entitled to relief.

I

On May 22, 2016, at approximately 10:00 p.m., William Marion waited at a bus stop in the Rainier Beach neighborhood of Seattle. Another individual, Lonzell Felder, was also at the bus stop. As Marion and Felder were waiting for a bus to arrive, Marion played music loudly over the speakers of his cell phone. Marion also walked "back and forth" within several feet of Felder. Felder began to feel uncomfortable because he did not know Marion and "it was late at night." Felder told Marion to "back up" several times. According to Felder, Marion responded, "you want me to back up; you want me to back up?" Marion then pulled out a knife.

Felder put his backpack in front of his chest because he "[d]idn't feel safe." Felder testified that he was afraid of the knife and felt threatened by Marion.

Gary Fuller, an on-duty Metro bus driver, parked the bus he was driving at the bus stop and walked toward a restroom located nearby. According to Fuller, as he was approaching the restroom, Felder said to him, "you got to help me out" and "this guy's got a knife, and he won't leave me alone." Fuller did not see the knife and thought Marion and Felder were "goofing around." However, Fuller noticed that Marion "had his hand in his pocket kind of—kind of strangely." Fuller then went into the restroom for several minutes.

After Fuller exited the restroom, Felder said to him, "you've got to help me. This guy's got a knife, and he's not going to leave me alone." According to Felder, Fuller responded by saying that "some people deserve to get knocked [out]." However, Fuller denied saying this.

According to Fuller, Marion started yelling that "he could go anywhere he wanted" and then walked into Fuller "like he was going to walk through me." Marion then punched Fuller in the head and face and, according to Felder, "they started fighting normally [before] they fall [sic] to the ground." While they were on the ground, Marion took out the knife and stabbed Fuller numerous times. Felder then telephoned the police.

De'Aris Lyles, a passerby, noticed the altercation between Marion and Fuller as he was crossing the street near the bus stop and "[saw] them pile over." Lyles ran over to the bus stop. Felder informed him that Marion had a knife. Lyles testified that he "could see blood on the bus driver" and Marion was "snarling and . . . biting at the bus driver's face," saying, "I'm going to fuck you up, I'm going to fuck you up." Lyles and Felder "were just screaming to let him go."

Marion and Fuller eventually separated and Marion "took off hightailing" and ran down an alleyway. After police officers arrived at the bus stop, Fuller, Lyles, and Felder provided a description of Marion to the officers. Shortly thereafter, an individual matching Marion's description was detained by police officers. An officer noticed that Marion had blood on his lips. Police officers then placed handcuffs on Marion's wrists and Marion expressed his belief that the stop was based on racial profiling.

Both Felder and Lyles agreed to participate in a show-up identification and police officers drove them to the location where Marion had been detained. Lyles testified that he identified Marion as the individual who stabbed Fuller based on Marion's face and clothing. During the show-up identification, Marion refused to

3

turn his face toward Felder, so Felder was unable to make out his "full face." Nonetheless, Felder identified Marion based on his clothing. Marion was then placed under arrest.

Fuller was treated at Harborview Medical Center. He had four stab wounds, bites on his head, and his shoulder was injured. Additionally, Fuller's diaphragm was lacerated and his injured spleen had to be removed. He was hospitalized for six days.

The State charged Marion with two counts of assault: assault in the first degree of Gary Fuller and assault in the second degree of Lonzell Felder, both with deadly weapon enhancements, "to-wit: a knife." The case proceeded to trial. A mistrial was declared after deliberations resulted in a hung jury. The case went to trial again. The second trial ended in a mistrial after the prosecutor elicited an impermissible comment on Marion's constitutional right to silence. At the conclusion of a third trial, a jury found Marion guilty on both counts as charged. The trial court imposed a sentence of 276 months of incarceration.

Marion appeals.

II

Marion contends that the trial court erred by giving a first aggressor instruction to the jury. According to Marion, the first aggressor instruction was not supported by any evidence that Marion initiated a provoking act toward Fuller before the actual assault and, thus, the instruction was not warranted. We disagree.

Whether sufficient evidence was adduced to warrant a first aggressor instruction is a question of law reviewed de novo. State v. Anderson, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). Moreover, "when determining if the evidence at trial was sufficient to support the giving of an instruction, the appellate court is to view the supporting evidence in the light most favorable to the party that requested the instruction." State v. Wingate, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005).

A trial court does not err by giving a first aggressor instruction "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." State v. Riley, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). Further, "[t]he provoking act must be intentional." State v. Kidd, 57 Wn. App. 95, 100, 786 P.2d 847 (1990). Although we have previously expressed a bright-line rule that a provoking act cannot be the "actual assault," Kidd, 57 Wn. App. at 100, our Supreme Court has recently clarified that this rule "cannot be applied in cases . . . where the defendant engaged in a course of aggressive conduct, rather than a single aggressive act." State v. Grott, 195 Wn.2d 256, 271, 458 P.3d 750 (2020).[2]

Marion contends that the first aggressor instruction was not justified because "[t]he two punches were an inextricable part of the final assault."

---

[2] In Grott, the defendant, over the course of several minutes, fired 48 shots from a gun at an individual who was sitting in a car, pausing to reload multiple times. 195 Wn.2d at 262-63. During the trial, a witness "testified that [the defendant] fired several shots before [the victim] even realized [the defendant] was there." Grott, 195 Wn.2d at 273. After the shooting, a loaded gun was discovered under the victim's body. Grott, 195 Wn.2d at 263-64. The Supreme Court held that a first aggressor instruction was justified because the defendant "engaged in a course of aggressive conduct, firing 48 shots [from his gun] over the course of several minutes and pausing to reload multiple times." Grott, 195 Wn.2d at 273.

However, a jury could have reasonably determined that Marion engaged in a course of aggressive conduct that provoked any need for him to use force against Fuller. Indeed, Fuller testified that, after he exited the restroom, Felder approached him, saying, "you've got to help me. This guy's got a knife, and he's not going to leave me alone." Then, according to Fuller, Marion started screaming, "I can go anywhere I want," and walked toward Fuller "like he was going to walk through me." After Marion walked into Fuller, Marion "threw up his hands and said, 'Get your hands off me.'" Marion then punched Fuller twice in the "[f]ace and head." According to Felder, Marion and Fuller "started fighting normally [before] they fall [sic] to the ground." While they were on the ground, Marion stabbed Fuller four times with a knife. This evidence supports a view that Marion "engaged in a course of aggressive conduct, rather than a single aggressive act." Grott, 195 Wn.2d at 271.

Marion claims that he did not engage in a course of aggressive conduct because, unlike the altercation in Grott, which lasted several minutes, Marion's altercation with Fuller "happened incredibly fast, in a manner of seconds." However, it is immaterial that the altercation between Marion and Fuller may have lasted for a short period of time. It is the course of conduct, not the length of time at issue, that our Supreme Court focused on in announcing the rule of Grott. Pursuant to that authority, the instruction was warranted.

The trial court did not err.

III

Marion asserts that the trial court erred by excluding (1) testimony of a Seattle firefighter that the Rainier Beach neighborhood had been nicknamed the "Knives and Guns Club," (2) testimony of a Seattle police officer that the neighborhood was a "high crime and violent area" and that, in 2016, 81 violent crimes occurred in the neighborhood, (3) testimony from Felder that the area was a "hot spot" and could be "a dangerous place for young, black men at night," and (4) testimony from Lyles that "a lot of gang activity" occurred in the area and that "black young men can be targets."[3]  Because this evidence was not relevant to whether Marion acted reasonably in using force against Fuller, the trial court did not err by excluding it from evidence.

The right to present a defense is guaranteed by both the United States and Washington Constitutions.  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence."  State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).  However, [t]hese rights are not absolute."  Jones, 168 Wn.2d at 720.

_____

[3] The State contends that, contrary to Marion's assertion, the trial court permitted Felder and Lyles to testify that Rainier Beach was a dangerous neighborhood.  However, the trial court did not permit Felder and Lyles to testify specifically that Rainier Beach was a "hot spot," had a lot of gang activity, and was dangerous for young black men.  Prior to the third trial, the trial court ruled that "as far as the issue of whether the—this Court's ruling on how much can come out about the dangerousness of the neighborhood, the information that was elicited during the first trial and that that is contemplated this time is essentially the same."  During the first trial, Marion questioned Felder about whether one would "be more on guard . . . in that area of town, knowing what you know about it," and Felder responded, "Knowing what I know about it, [one] would."  Further, Lyles, upon being asked by Marion if he was "on edge" in the neighborhood, responded, "Me, not so much because I know the area, but if you weren't from around there you probably would be."  Thus, although the trial court permitted Felder and Lyles to testify as to the dangerousness of the Rainier Beach neighborhood, the extent to which they could testify to the neighborhood's character was limited.

Indeed, "[d]efendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence." Jones, 168 Wn.2d at 720.

A claim that evidentiary rulings violated a defendant's constitutional right to present a defense are reviewed pursuant to a two-step process. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, the challenged evidentiary rulings are reviewed under an abuse of discretion standard. Arndt, 194 Wn.2d at 797. Then, if necessary, the rulings are reviewed de novo to determine whether they violated a defendant's constitutional right to present a defense. Arndt, 194 Wn.2d at 797-98.

Here, the trial court excluded the testimony from the firefighter and police officer because it did not "have any reason to think that the information . . . was information that was known to Mr. Marion at the time. And—and all that is relevant is what was known to him at the time." Further, the trial court ruled that

> Mr. Felder and Mr. Lyles[] may testify as to, similarly, things that were going on in their minds. What information they had that informed how they acted that night to describe the full scenario but not general testimony about the neighborhood from their perspective because, again, it's not relevant.

Consistent with these rulings, the trial court both permitted Marion to testify that, in his perception, Rainier Beach was a dangerous neighborhood and admitted evidence that Marion's jaw had previously been broken in the area.

Marion does not contend that the evidence excluded by the trial court was known to him when he used force against Fuller. Rather, he asserts that this evidence was relevant to the objective portion of a claim of self-defense because

8

the evidence tended to show "that the neighborhood was, in fact, dangerous." Marion is wrong.

"The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm from the victim.'" Grott, 195 Wn.2d at 266 (quoting State v. LeFaber, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009)). As such, self-defense

> incorporates both objective and subjective elements. The subjective portion requires the jury to stand in the shoes of the defendant and consider *all the facts and circumstances known to him or her*; the objective portion requires the jury to use *this information* to determine what a reasonably prudent person similarly situated would have done.

State v. Walden, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997) (emphasis added).

In other words, to be material to a claim of self-defense, evidence must have a tendency to show what was known to the defendant when he or she used force. Because there was no evidence that Marion had knowledge of the information that was contained in the testimony excluded by the trial court, this information was immaterial to Marion's self-defense claim.

Next, Marion asserts that the evidence tending to demonstrate that Rainier Beach was a dangerous neighborhood should have been admitted because the "evidence was akin to evidence of [a] victim's propensity for violence." Although "[e]vidence of a victim's propensity toward violence that is known by the defendant is relevant to a claim of self-defense," State v. Duarte Vela, 200 Wn. App. 306, 319, 402 P.3d 281 (2017), Washington courts have not permitted evidence of a neighborhood's character to be used to establish a victim's

9

propensity for violence. Indeed, if a defendant could establish a victim's propensity for violence merely by presenting evidence of a neighborhood's character, people in certain neighborhoods would be afforded less protection under the law solely based upon the area in which they live, work, or happen to travel through. We decline to adopt a rule that would noxiously discriminate against individuals on this basis.

Accordingly, the trial court did not err by excluding certain evidence that tended to show that Rainier Beach was a dangerous neighborhood.

IV

Marion contends that the trial court erred by admitting a video of his show-up identification because the video was unduly prejudicial, showing him handcuffed, standing in a spotlight, and surrounded by police officers. [4]

---

[4] The State claims that Marion did not properly object to the show-up identification video because, at trial, he did not assert the specific ground that he now asserts as to why the video was inadmissible. Specifically, after the State moved to admit the video of Marion's show-up identification into evidence, the following exchange occurred between Marion's attorney and the trial court:

> [Defense]: And we would object to hearsay and foundation, cumulativeness, overly prejudicial, and relevance.
> The Court: Are these additional objections or not?
> [Defense]: They're—they're the previous objections.
> The Court: Okay. If—if you could clarify when you're making additional objections, that would be helpful. Exhibit 1 is admitted.

According to the State, Marion's attorney's statement that he was making the "previous objections" refers to the objections raised during the second trial. At that trial, Marion did not object to the show-up identification video on the specific ground that it depicted him handcuffed, surrounded by police, and standing in a spotlight. However, Marion did raise this specific objection prior to the first trial:

> The Court: . . . . Okay. Moving on. We have the 3.6 issue regarding the showup.
> [Defense]: Defense is asking the court to exclude the identifications of Mr. Felder and Mr. Lyles at the showup . . . .
> . . . .
> When at the scene, Mr. Marion is handcuffed. He's in front – he's surrounded by four officers that are in uniform. He is next to a uniformed, marked patrol car. There's a spotlight that is shining directly on him and on the face.

Moreover, according to Marion, the video was only minimally relevant because his identity was not in dispute. We hold that the trial court did not err by admitting the show-up identification video into evidence.

"[A] trial court's evaluation of relevance under ER 401 and its balancing of probative value against prejudicial effect . . . under ER 403 [are reviewed] with a great deal of deference, using a 'manifest abuse of discretion' standard of review." State v. Luvene, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995) (quoting State v. Russell, 125 Wn.2d 24, 78, 882 P.2d 747 (1994)). Although, "[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists." State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

Here, the show-up identification video was relevant to whether Marion was properly identified by Lyles and Felder as the individual who stabbed Fuller. Indeed, after Marion was detained by police officers, both Lyles and Felder agreed to participate in a show-up identification. During the show-up identification, Felder was able to see Marion's clothing but could not make out his "full face." A police officer "tr[ied] to get [Marion] to face the police car so [Felder] could see him, and [Marion] would turn to face away." Thus, the video was relevant to whether Lyles and Felder had a proper opportunity to observe and identify Marion as the individual who assaulted both Felder and Fuller.

---

Thus, it appears that the trial judge and defense counsel may have been "talking past one another" in the quoted exchange from the third trial. While the trial judge may have considered the "previous objections" to be those interposed during the second trial, as the State contends, it is equally possible that defense counsel interpreted the question as pertaining to *all* previous objections—those raised during or before either of the two prior trials. There is no way for us to resolve this ambiguity. Accordingly, we treat the objection as being properly preserved.

Moreover, contrary to Marion's assertion, Marion's identity was put at issue during the trial. Notably, Marion's attorney questioned Felder regarding his poor eyesight and ability to identify Marion during the show-up identification:

Q      I want to go back to your eyesight, Mr. Felder. You said that
        you had pretty bad eyesight, right?

A      Uh-huh.

Q      And you don't wear any glasses or contact lenses; is that
        correct?

A      No.

Q      And you had some difficulty when you were doing the show-
        up identification seeing the individual, right?

A      Uhm, he wouldn't turn his full face, so, I couldn't, like, make
        out his full face.

Q      Okay. And, they had lights on him; is that right?

A      Yes.

Q      And you said in direct testimony that you never actually saw
        his full face, right?

A      Yes.

Q      So, you were making the identification based on the
        clothing—

A      Yes.

Shortly thereafter, Marion's attorney also questioned Felder about a Facebook post in which Felder described Marion as potentially being Mexican even though Marion is Black:

Q      You also posted on Facebook the night of this incident, too,
        right?

A      Uhm, yes.

12

. . . .

Q     Okay. And, on your postings—well, Mr. Marion to you, when you had to describe him, do you recall—do you recall describing him you thought as maybe Mexican?

A     Uhm, yeah, I—I think I did.

Clearly, Marion questioned Felder concerning his ability to identify "the individual" detained by police officers during the show-up identification. As such, Marion's identity as the perpetrator was at issue at trial.

Nonetheless, according to Marion, the trial court erred by admitting the show-up identification video because it was unduly prejudicial. In support of his argument, Marion cites to two published decisions that involved defendants who were ordered by the trial court to be handcuffed or shackled at or prior to trial. In particular, Marion cites to the Supreme Court's opinion in State v. Finch, 137 Wn.2d 792, 842, 975 P.2d 967 (1999), wherein the issue was whether a trial court abused its discretion by ordering a defendant to be shackled during his trial. In addition, Marion cites to Division Three's opinion in State v. Early, 70 Wn. App. 452, 462, 853 P.2d 964 (1993), in which the court stated that, during a trial, "handcuffing should not be permitted except to either prevent escape, prevent the accused from injuring others or to maintain a quiet and peaceable trial."

Marion asserts that, although he "was not handcuffed or restrained during trial, . . . the effect was the same when the trial court admitted the video of [his] showup identification." Not so. Neither of the opinions cited by Marion indicate that a trial court errs by admitting evidence showing a defendant handcuffed after being detained by police officers. Indeed, in Early, Division Three held that a trial

13

court did not err by refusing to order a mistrial where the jury panel saw the defendant in handcuffs during jury selection. 70 Wn. App. at 462. Moreover, as the Supreme Court explained in Finch, "[w]hen the court allows a defendant to be brought before the jury in restraints the 'jury must necessarily conceive a prejudice against the accused, *as being in the opinion of the judge* a dangerous man, and one not to be trusted, even under the surveillance of officers.'" 137 Wn.2d at 845 (emphasis added) (quoting State v. Williams, 18 Wash. 47, 51, 50 P. 580 (1897)). To the contrary, in this case, the show-up identification video gave no indication of the trial judge's opinion as to whether Marion was dangerous. The cases relied on by Marion are entirely inapposite.

We have previously explained that a jury's knowledge of a defendant's custody status does not prejudice the defendant in the same way that being shackled in front of the jury during a trial might do so:

> [A]lthough references to custody can certainly carry some prejudice, they do not carry the same suggestive quality of a defendant shackled to his chair during trial. Jurors must be expected to know that a person awaiting trial will often do so in custody. . . . In this case, a reasonable juror would know that a defendant in a first degree murder trial was not likely to be released pending trial unless he paid a substantial amount of bail, regardless of whether he was later found to be innocent.

State v. Mullin-Coston, 115 Wn. App. 679, 693, 64 P.3d 40 (2003), aff'd, 152 Wn.2d 107, 95 P.3d 321 (2004).

Similarly, jurors should be expected to know that a person, upon being detained for the suspected stabbing of another, will likely be placed in handcuffs by the police.

14

The trial court did not abuse its discretion by admitting the video into evidence.

V

Marion also raises numerous claims of error in his statement of additional grounds.  None of these claims have merit.

A

Marion first asserts that, after the second trial ended in a mistrial, the trial court erred by denying his motion to dismiss based on double jeopardy and governmental misconduct under CrR 8.3(b).  We disagree.

During the second trial, Marion moved for a mistrial because the prosecutor commented on his right to remain silent.  The trial court granted the motion.  Subsequently, Marion filed a motion to dismiss based on double jeopardy and governmental misconduct under CrR 8.3(b).  The trial court denied that motion.

"'Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.'"  State v. Cochran, 51 Wn. App. 116, 119, 751 P.2d 1194 (1988) (quoting Oregon v. Kennedy, 456 U.S. 667, 676, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982)).  "This standard merely calls for the court to make a finding of fact by inferring the existence or nonexistence of intent from objective facts and circumstances."  Cochran, 51 Wn. App. at 119.  Furthermore, "[a] determination of whether certain actions constitute intentional misconduct is a finding of fact

15

which will not be disturbed unless it is clearly erroneous." Cochran, 51 Wn. App. at 120.

The trial court's ruling met this standard. In particular, the trial court found that "[t]he prosecutor's line of questioning was not made in bad faith, was neither flagrant nor ill intentioned, and was not an effort to goad defense into moving for mistrial." Indeed, after the mistrial was declared, the prosecutor informed the trial court that he, in good faith, believed in a different interpretation than the trial court of the case law regarding the right to remain silent. The trial court accepted this explanation as truthful. Thus, the court's finding of fact was supported by the record.

The trial court also did not err by denying Marion's motion to dismiss under CrR 8.3(b). Under that rule, a trial court "may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." A trial court's decision on a motion to dismiss under CrR 8.3(b) is reviewed for manifest abuse of discretion. State v. Moen, 150 Wn.2d 221, 226, 76 P.3d 721 (2003). Here, the trial court concluded that there was no governmental misconduct because the "State's actions were neither ill-intentioned, nor made in bad faith."

The trial court's ruling was supported by the record. Thus, the trial court did not err by denying Marion's motion to dismiss based on a violation of CrR 8.3(b).

B

Marion next contends that his right to a jury of his peers was violated because there was not a single African-American in the jury pool. However, "[t]he absence of any particular group of people on a jury does not violate a defendant's right to a jury of his peers, unless there are circumstances indicating purposeful discriminatory exclusion." State v. Barron, 139 Wn. App. 266, 280, 160 P.3d 1077 (2007). Because Marion cites to no evidence of purposeful discriminatory exclusion, he does not establish the claimed error.

C

Marion next asserts that the trial court erred by denying his motion for a continuance before the third trial commenced. Marion is wrong.

A trial court's decision to grant or deny a motion for continuance is reviewed for abuse of discretion. State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). Prior to the third trial, Marion's attorney moved for a continuance, explaining that "Mr. Marion's having a difficult time trying to process everything. He is very concerned. He feels like he's kind of railroaded through the system, has not had a chance to really understand what everything means." The trial court denied the motion:

> I am not hearing a compelling reason to continue the case at this point in time. Everybody was ready a week ago, more than a week ago. Really nothing has changed other than we started a trial and then ended it. I would like to complete jury selection today. And if there is something more specific, I guess I would always be willing to hear it. But, I'm not hearing a—a reason to continue. And—and of course there is reason on both sides for the parties to want the matter to be resolved. And it has been over two years. So, at this point in time I'm going to deny the motion.

The trial court's decision was not manifestly unreasonable or based on untenable grounds or reasons. See Stenson, 132 Wn.2d at 701. Accordingly, the trial court did not err by denying Marion's motion for a continuance.

D

Marion next contends that the trial court erred by permitting an individual other than Lyles to read the testimony that Lyles gave during the first trial. According to Marion, this testimony was hearsay and the jury was not able to observe Lyles' body language in order to gauge the credibility of the testimony. However, Lyles' testimony was properly admitted under ER 804(b)(1),[5] which provides an exception to the hearsay rule for certain former testimony. Thus, the trial court did not err by admitting Lyles' testimony. Moreover, the trial court did not err in exercising control over the mode of the evidence's presentation. See ER 611(a); State v. Hakimi, 124 Wn. App. 15, 19, 98 P.3d 809 (2004) (mode of giving testimony within discretion of trial judge).

E

Marion next avers that Lyles' statements that Marion was the "aggressor" in the altercation between Marion and Fuller constituted improper opinion testimony.[6] In support of his argument, Marion asserts that "[n]o witness, lay or

---

[5] ER 804(b)(1) provides that the following evidence is admissible when a hearsay declarant is unavailable:

*Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

[6] For example, Lyles testified that "it was easy to tell the Defendant was the aggressor." "Well, [Marion] was definitely the aggressor," and "You could tell [Fuller] wasn't the aggressor in the situation."

expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). However, "opinion testimony is not improper when it does not directly comment on the defendant's guilt, is otherwise helpful to the jury, and is based on reasonable inferences from the evidence." State v. Yarbrough, 151 Wn. App. 66, 93, 210 P.3d 1029 (2009).

Lyles first noticed the altercation between Marion and Fuller when he was crossing the street and "[saw] them pile over." Lyles then observed blood on Fuller, Marion snarling and biting at Fuller's face, and Fuller asking for help. Given Lyles' observations, his comments that Marion was the aggressor did not directly comment on Marion's guilt, were helpful to the jury, and were based on reasonable inferences from his personal observations. There was no error in their admission.

F

Marion next argues that the trial court erred by denying his request to use a proposed juror questionnaire. In his trial brief, Marion argued that the questionnaire was appropriate because "many people are not inclined to share their views regarding violence, self-defense and race." The trial court denied Marion's request. "[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of *voir dire* will not be disturbed on appeal." State v. Davis, 141 Wn.2d 798, 826, 10 P.3d 977 (2000). Marion fails to demonstrate how the

trial court's decision was an abuse of discretion or how it substantially prejudiced his rights. No error is established.

G

Marion next asserts that the trial court should have dismissed an unidentified juror who may have heard the prosecutor speak to a witness outside of the courtroom. Appellate courts "review[] the trial court's determination of whether to dismiss a juror for abuse of discretion." State v. Depaz, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). Here, the prosecutor informed the trial court that an unidentified juror may have overheard the prosecutor as he was speaking to a witness outside of the courtroom. The trial court then asked the entire jury whether any of the jurors overheard the prosecutor speaking to the witness. No juror answered in the affirmative. The trial judge acted properly. There was no abuse of discretion.

H

Marion next contends that the trial court erred by denying his request to question Fuller about a Metro complaint that may have been filed against him.[7] We disagree.

"This court reviews the trial court's determination of the relevance of prior acts for abuse of discretion." State v. Sexsmith, 138 Wn. App. 497, 505, 157 P.3d 901 (2007).

---

[7] According to Marion's defense attorney, Fuller, during a pretrial interview, indicated that a bus passenger had filed a Metro complaint against him for grabbing the passenger's arm after the passenger had taken another individual's phone.

At trial, Marion argued that the Metro complaint filed against Fuller was relevant to whether Fuller was aware of a Metro policy that "they can't threaten to have contact or have contact with individuals." In turn, Marion asserted that this was relevant to the question of whether Fuller threatened Marion by stating that "some people deserve to get knocked [out]."[8] The trial court denied Marion's request to question Fuller about the Metro complaint but permitted Marion to question Fuller about his knowledge of the Metro policy. In doing so, the trial court reasoned that the evidence of the Metro complaint against Fuller was inadmissible as a prior act under ER 404(b) and that its relevance, if any, was outweighed by its prejudicial effect. The trial court did not abuse its discretion by denying Marion's request to question Fuller about a Metro complaint that was potentially filed against him, especially given that the court allowed the witness to be questioned regarding his knowledge of the policy at issue. There was no error.

I

Marion next avers that the prosecutor improperly stated that Marion was the only person with a deadly weapon during the altercation with Fuller.[9] This was improper, according to Marion, because Fuller's hands were deadly

---

[8] In his statement of additional grounds, Marion also claims that Fuller lied when he denied making any statements to the effect that Marion deserved to get knocked out. However, "[q]uestions of credibility are left to the trier of fact and will not be overturned on appeal." State v. Boot, 89 Wn. App. 780, 791, 950 P.2d 964 (1998). Thus, assuming that Marion assigns error to Fuller's testimony, Marion does not establish an entitlement to relief.

[9] Marion does not cite to any portion of the record wherein the prosecutor made such a statement. In any event, had the prosecutor made such a statement, it would not have been improper.

weapons and Marion's knife—which had a three-inch blade—was not a deadly weapon. We disagree.

By statute,

"Deadly weapon" means any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

RCW 9A.04.110(6).

Because hands are not a weapon, device, instrument, article, or substance, they need not be considered to be deadly weapons. On the other hand, a knife with a three-inch blade might, under certain circumstances, be a deadly weapon because it could be used in a manner capable of causing death or substantial bodily injury. No error is shown.

J

Marion next contends that the trial court's instructions on self-defense misstated the law insofar as they did not state that the jury could consider Marion's subjective impressions of the facts and circumstances. However, the trial court's instructions clearly provided that a defendant is entitled to act on appearances in defending himself:

A person is entitled to act on appearances in defending himself, if he believes in good faith and on reasonable grounds that he is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.[10]

---

[10] This instruction followed the Washington Pattern Jury Instruction:
A person is entitled to act on appearances in defending [himself] [herself] [another], if [he] [she] believes in good faith and on reasonable grounds that [he] [she] [another] is in actual danger of injury, although it afterwards might develop

Accordingly, the trial court did not fail to instruct that a person is entitled to act on appearances.

VI

Finally, Marion asserts that cumulative error entitles him to a new trial. "The cumulative error doctrine applies when several trial errors occurred and none alone warrants reversal but the combined errors effectively denied the defendant of a fair trial." State v. Jackson, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). Because multiple trial errors did not occur, the cumulative error doctrine does not apply.

VII

After our opinion in this matter was filed, Marion filed a motion for reconsideration in which he requests, for the first time, that we remand the matter for resentencing in light of our Supreme Court's decision in State v. Blake, No. 96873-0, slip op. at 29-30 (Wash. Feb. 25, 2021), http://www.courts.wa.gov/opinions/pdf/968730.pdf, ___ Wn.2d ___, 481 P.3d 521 (2012). Because resentencing appears to be warranted, we remand the cause to the superior court for Marion to be sentenced in a manner consistent with the Blake decision.

---

that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.04 (4th ed. 2016).

The convictions are affirmed.  The sentences are reversed.  The cause is remanded to the superior court for further proceedings consistent with this opinion.

Dwyer, J.

WE CONCUR:

Coburn, J.          Mann, C.J.