**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84591-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JAMES KARIUKI KIRUMWA, | |
| Appellant. | |

ANDRUS, C.J. — James Kirumwa was convicted of second degree assault after he physically attacked his ex-girlfriend's father. He appeals this conviction, arguing that he received ineffective assistance of counsel when his defense counsel moved for a mistrial after several jurors expressed a reluctance to return to the courthouse in the midst of the COVID-19 pandemic. He further contends that the trial court erred in giving a first aggressor jury instruction and in admitting testimony that his ex-girlfriend was afraid of him. We affirm.

<u>FACTS</u>

Faith Gituma emigrated to Pennsylvania from Kenya with her family in 2010. Gituma dated Kirumwa briefly while still living in Kenya. When Kirumwa moved to Washington in 2016, he reached out to Gituma to rekindle their relationship. She

Citations and pin cites are based on the Westlaw online version of the cited material.

moved west to be with him and the two lived together in Federal Way before moving to a house in Tacoma in 2018.

In June 2019, Kirumwa moved out of their home but kept most of his clothing there. Thereafter Kirumwa continued to use one of Gituma's vehicles. Kirumwa had a remote control to the garage which he used to access her cars and his personal belongings inside the house. In the weeks leading up to August 2019, Kirumwa had taken one of Gituma's cars and refused to bring it back when she asked.

Gituma's father, Simon Muriithi, came to visit her in part because she had begun to feel unsafe around Kirumwa. She also arranged to have security cameras installed at her house because of her fear of Kirumwa.

On August 3, 2019, while an ADT security camera technician was installing the cameras, Kirumwa knocked on the front door. When Gituma saw Kirumwa, she asked her father to answer the door because she was afraid. She stayed in the kitchen with the ADT technician. When Kirumwa was unable to get in through the front door, he used his remote control to get into her garage. Muriithi opened the door to the garage and confronted Kirumwa.

Muriithi testified that he greeted Kirumwa and asked what he wanted. Kirumwa, who seemed "[v]ery angry," stated he had "come to pick up my stuff." Muriithi asked Kirumwa to bring him the keys to Gituma's car. In response, Kirumwa shouted "I don't have anybody's car." Muriithi told Kirumwa that he could not pick up anything until he called the police. Kirumwa refused to sit and wait for the police to arrive and started coming up the stairs to the house. Muriithi tried not

to let him up the stairs and repeated that he could not enter the house until the police arrived. It was at that point, Muriithi stated, that Kirumwa started punching him in the head, cracking his lip.

Kirumwa punched Muriithi six or seven times. Muriithi did not hit Kirumwa in return but pushed Kirumwa, trying to get away from him. Kirumwa began sarcastically calling Muriithi "dad" and telling him "you wanted to fight, now here you are."

When Gituma and the ADT technician came to Muriithi's aid, Kirumwa fled into the kitchen. The three followed Kirumwa and Muriithi pointed to his head and asked why he had hit him. Kirumwa, standing next to the stove, picked up a plate and struck Muriithi on the face, causing the plate to break. Kirumwa then picked up a cooking pot and struck Muriithi on the head with it. When Muriithi began to retreat, Kirumwa threw the pot at him and told Muriithi, "Come back, dad. Come back. You wanted to fight." By this point, Muriithi was bleeding profusely so Gituma grabbed her father and withdrew with him into a corner.

Kirumwa then took two knives out of a drawer, began waving them in the air and threatening Muriithi, saying "Come to me now" and "Let's finish it up." Gituma screamed to her father that "he has knives. Run away, run away." Muriithi, afraid Kirumwa intended to stab him, retreated into the living room. Muriithi testified that he believed Kirumwa was going to stab him. When Kirumwa realized that the ADT technician was on the phone calling 911, he put the knives back in the drawer, left through the kitchen door, punching the wall as he fled.

- 3 -

Police arrived and collected the knives and cooking pot as evidence. When police processed the items for fingerprints, they were able to conclusively match a fingerprint from one of the knives to Kirumwa.

The State charged Kirumwa with assault in the first degree, for his intentional assault of Muriithi. It alternatively charged him with assault in the second degree for the same conduct.

Trial began on March 11, 2020. The trial court acknowledged that COVID-19 was complicating jury trials and causing more jurors to be excused for hardships. Nonetheless, the parties selected a jury, made opening statements, and the State called Gituma to testify.

After recessing for the weekend, the State informed the court that it was unable to call either Muriithi or the ADT technician because both witnesses lived out-of-state and could not safely travel in the pandemic. The trial court acknowledged that "there is currently a crisis related to COVID 19 . . . sweeping through the country" and recessed the trial until May 11, 2020.

The parties reconvened for a status hearing on May 5, 2020. The trial court noted that the Supreme Court had ceased all jury trials through July 6, but that there was an exception for cases that had already impaneled a jury. Under this exception, the parties could move forward with trial on May 11 as planned so long as they complied with social distancing. With Kirumwa's consent, defense counsel then moved for a mistrial, which the court granted.

Kirumwa's second trial began on June 9, 2021. Gituma, her father, and a former crime scene detective, Meaghan Jones-Rush, Tacoma Police Detective

Young Song, Officer David Djervatuis Dobbins, and Officer Bret Terwilliger, testified in the State's case-in-chief, consistent with the facts set out above.

Kirumwa took the stand in his case-in-chief and testified that he had acted in self-defense. According to Kirumwa, earlier in his relationship with Gituma, Muriithi had demanded that Kirumwa pay a $29,000 dowry before he would permit Gituma and Kirumwa to marry. He claimed this unpaid dowry had been an issue since 2017. Kirumwa recounted that when he and Gituma had visited Gituma's family in the past, Muriithi had slapped him around, upset over the unpaid dowry.

Kirumwa testified that he had just returned home from working on the east coast on August 3, 2019. He stated that when he arrived at Gituma's home, Muriithi grabbed him by the shirt and told him "You have to leave the house." He testified that Muriithi began punching and head butting Kirumwa before dragging him into the kitchen where Muriithi tried to assault Kirumwa with a garden tool. According to Kirumwa, Muriithi hurt himself when he slipped on the wet floor and hit his head on the countertop.

Muritthi denied ever grabbing any kind of tool or weapon to use against Kirumwa on the day of the assault. On rebuttal, Muriithi denied ever speaking with Kirumwa about a dowry. He also denied ever grabbing Kirumwa or slapping him in the face. He testified that such conduct was "taboo" in his culture because Kirumwa was at the time dating his daughter.

Prior to closing, the parties agreed to dismiss the second degree assault charge as a separate count and to proceed with a single count of first degree assault, with instructions to the jury for second degree assault as a lesser included

offense. The court provided several instructions on self-defense and, over Kirumwa's objection, instructed the jury that

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

The jury found Kirumwa guilty of assault in the second degree and found that he was armed with two separate deadly weapons—a chef knife and a steak knife. Kirumwa was sentenced to 27 months confinement.

Kirumwa appeals.

ANALYSIS

A. Ineffective Assistance of Counsel

Kirumwa first argues that he was denied effective assistance of counsel when his attorney moved for a mistrial of the first trial. Because he cannot establish that counsel's performance was deficient, we reject this claim.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's representation resulted in prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have

been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Because the defendant must show both prongs, a failure to demonstrate either prong will end the inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Deficient performance occurs when counsel's performance cannot be attributed to any conceivable legitimate tactic. *State v. Carson*, 184 Wn.2d 207, 218, 357 P.3d 1064 (2015) (quoting *Grier*, 171 Wn.2d at 33). There is a strong presumption that counsel exercised reasonable professional judgment to render adequate assistance. *Id.* at 216. To rebut this presumption, the defendant has the burden to establish that there are no legitimate strategic or tactical reasons explaining counsel's performance. *McFarland*, 127 Wn.2d at 335-36.

Kirumwa argues that he was "gifted an opportunity" to either have the case dismissed or to force the State to proceed without two of its three primary witnesses when the pandemic prevented these witnesses from flying to Washington to testify. He contends counsel's performance was deficient because counsel "placed his concerns for the jurors above his duty to represent his client" when he ignored the tactical advantage of proceeding with trial and moved for a mistrial.

This argument is, however, based on a faulty premise—that the trial court would have forced the State to proceed to trial when the pandemic precluded Muriithi from traveling to Washington to testify. On March 16, 2020, the prosecutor reported to the court that one juror had become ill and there was a concern that the juror became contagious and may have infected the other jurors. The

- 7 -

prosecutor had made the decision to call off flying Muriithi, a "63-year-old victim," to Washington as that would place him at risk to his health. The prosecutor informed the court that the State had also reached out to the ADT technician, now living in Alabama, who indicated he was not comfortable getting on a plane to travel to Washington. The State asked the court to recess the trial because of the "unprecedented situation with this pandemic." The prosecutor asked to stop the trial "simply because that will minimize the risk to the jurors that are here."

In response to this request, Kirumwa's attorney recognized that they were "in a situation where it's unprecedented." He noted that "[l]egally I think the Court has good cause to do virtually anything." He also suspected that things were not going to get better any time before June and that "they're talking about banning all flights in and out of this state." He proposed three choices for the court. First, he said the court could continue trial to April 26 because "obviously this pandemic is about as good a cause—it's an act of God. It's about as good a cause as one can find." Second, he suggested the court could declare a mistrial. Finally, he indicated the court could dismiss the case "without prejudice and have it start all over again."

Kirumwa's attorney then discussed his concerns with these options. As for a continuance, he was concerned that the jurors had already heard some of the case and that these same jurors could forget whatever it was that they had already heard. There were also logistical concerns, he said, as to whether these people would be able to return or become ill. *Id.* His preference at that point, because of the "unknowns with just continuing [trial]," was to start all over again, either via a

mistrial or a dismissal without prejudice. The court asked if counsel was making a motion for a mistrial, to which counsel responded that he would leave it to the court's discretion.

The court explicitly stated that "jeopardy has attached in this case" and it did not want to make a decision that would result in the case not going forward because of a violation of double jeopardy. It made a record of the state of emergency:

> So there is currently a crisis related to COVID 19, which is a flu epidemic that's sweeping through the country and particularly our state. There has been a state of emergency that's been declared both federally and within our state. Governor Inslee has issued several proclamations, including that all gatherings now of anything more than 50 people are prohibited, and those under 50 have several health restrictions associated with them.
> . . . .
> Washington has been identified as a hot spot, and there is, as [defense counsel] indicated, speculation that travel will soon be restricted, both in and out of Washington, which I think goes to the concerns of bringing witnesses here from out of state, not only for the health issues that are associated with that but the potential that a witness could get stuck in Washington and unable to leave.
>
> And finally, our Superior Court has issued emergency orders as of Friday indicating that there will be no juries from here until April 27th except those currently in session. And I concur with [the prosecutor's] concerns that I do think it puts current jurors at obviously a very large disadvantage, that they are somehow being ordered to come to court and [expose] themselves to illness and, again, share the concern that Juror No. 3 is home sick today and we don't know when she was contagious to the others.

The court noted that its executive committee was going to meet that same day to discuss further restrictions to people entering the courthouse. The court then discussed the risk of demanding that Muriithi travel to Washington at that time:

> As [the prosecutor] indicated, the alleged victim is 63 years old. That age by itself has been determined to be at increased risk for the virus. They certainly aren't recommending that anybody above the age of

> 60 travel, which this person would obviously have to do . . . to present testimony, and then also indications that the other witness, who is not over 60 but has concerns about traveling.

The court then rejected the option of dismissing without prejudice and concluded that the only viable option at that point was to recess the trial until May 4 or to declare a mistrial. But the court made it clear that "[w]e're not proceeding with anything. As soon as we are done here with this proceeding, we're not going to take additional witnesses' testimony. I'm not going to put these jurors at increased risk at all."

The court then chose to poll the jurors to determine if each could return in May if the court recessed the trial. Based on the responses each juror provided, it chose to recess the case and to return May 11 to continue trial. The court indicated it would not grant a mistrial "any time it is not a direct request from the Defense."

This colloquy between the court and counsel and the rulings the court made that day make it abundantly clear that the court would have never granted a defense request to continue with trial in light of the emergency it faced and the health risks to which the jurors would have been exposed.

When the parties next appeared for a status conference on May 5, 2020, the trial court indicated that "we are currently in a global pandemic related to the COVID virus." It noted the existence of Supreme Court orders halting jury trials until July 6, but also recognized that Kirumwa's trial fell within an exception for trials with empaneled juries. At that point, defense counsel moved for a mistrial and explained his reason for doing so:

> I will make a formal motion [for] mistrial [in] this case. And I don't do that lightly, but I base that on several circumstances. Obviously

- 10 -

we're in a pandemic. People in this state and around the country are dying by the thousands.

We pay these jurors ten bucks a day or whatever, which is to me a disgrace, and now we're asking them to risk their lives on top of that. . . . It's not fair to them. It's not fair to us.

Counsel noted that bringing jurors to the courthouse would put them in the situation of violating the governor's lockdown order. And such a move would risk people's lives and that was "just not fair." He concluded that there was a "legitimate and a proper basis for a mistrial." The court, in response, stated that "I know you understand this is of course potential double jeopardy." The court then sought assurances from Kirumwa that he had been advised that the State would be permitted to retry him and that he agreed with his counsel's request. The court explained that it had analyzed double jeopardy case law and had considered converting to remote proceedings but had concerns about doing so given that four of their eleven jurors had expressed concerns about returning to the courthouse and the complication of using interpreters for Kirumwa and Muriithi. The court then granted the defense motion for a mistrial.

This record reveals that defense counsel had carefully thought through Kirumwa's options and articulated a legitimate tactical reason for moving for a mistrial. First, counsel had concerns about the lengthy delay they had already had in testimony. The State's first witness, Gituma, had testified nearly two months earlier, on March 12. Counsel was reasonably concerned that the jurors would not remember what they had heard and could reasonably conclude that it would be better for his client if the jury heard and evaluated all of the testimony at the same time.

- 11 -

Second, counsel was aware that if he insisted in bringing jurors into the courthouse, he was placing their health at risk. He could have reasonably concluded that doing so would lead the jurors to resent him and Kirumwa for putting them in such an untenable position. Such a conclusion was reasonable, particularly after learning that only eleven of the jurors were willing to return. Counsel had legitimate concerns both about the impact of the jurors' frustration at being forced to return at risk of their own health and the risk that not all jurors would be able to return, resulting in a later mistrial out of manifest necessity.

Finally, it was abundantly clear from the record that counsel had little hope that the trial court would insist on the State continuing with trial.

Because there were legitimate tactical explanations for counsel's decision to move for a mistrial, Kirumwa cannot demonstrate that counsel's performance was deficient. Thus, his claim for ineffective assistance of counsel fails.

B. First Aggressor Jury Instruction

Kirumwa argues that the trial court erred in giving a first aggressor jury instruction because the facts of the case did not support it. We disagree.

Jury instructions are sufficient when they allow each party to argue its theory of the case, are not misleading, and properly instruct the jury on the applicable law. *State v. Sibert*, 168 Wn.2d 306, 315, 230 P.3d 142 (2010).

A defendant's use of force is lawful and self-defense can be asserted as a defense if the defendant subjectively and reasonably believes that the victim will inflict imminent harm. *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020). However, "the right of self-defense cannot be successfully invoked by an

aggressor or one who provokes an altercation." *Id.* (quoting *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Therefore, a first aggressor jury instruction should be given if the evidence supports the instruction. *Id.*

There is sufficient evidence to support a first aggressor instruction where the jury could determine through credible evidence that the defendant provoked the need to act in self-defense. *Id*. at 273. The instruction is appropriate where there is conflicting evidence as to whether the defendant's conduct precipitated a fight. *Riley*, 137 Wn.2d at 910. In cases in which the defendant undisputedly engaged in a single aggressive act, and that act was the sole basis for the charged offense, a first aggressor instruction is inappropriate. *Grott*, 195 Wn.2d at 272. But "where there is evidence that the defendant engaged in a course of aggressive conduct, rather than a single aggressive act, 'the provoking act can be part of that "single course of conduct."'" *Id.* at 273 (quoting *State v. Sullivan*, 196 Wn. App. 277, 290, 383 P.3d 574 (2016)).

Whether sufficient evidence was adduced to warrant a first aggressor instruction is a question of law reviewed de novo. *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). In making this determination, we view the evidence in the light most favorable to the party who proposed the instruction. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005).

Viewed in the light most favorable to the State, the evidence established that Kirumwa engaged in a course of aggressive conduct that included multiple assaultive actions. This course of conduct began when he refused to accede to Muriithi's request that he sit and wait in the garage and punched Muriithi in the face

multiple times. It continued when he struck Muriithi in the face with a plate, repeatedly struck Muriithi with a cooking pot and then threatened him with two kitchen knives. As the trial court determined, this evidence supports a finding that Kirumwa provoked any need to act in self-defense.

Kirumwa contends that the instruction was not appropriate here because he had engaged in no aggressive act before assaulting Muriithi with the knives. Our Supreme Court rejected a similar argument in *Grott.* In that case, the defendant fired 48 shots from a gun at a single targeted victim over the course of several minutes, pausing to reload multiple times, causing the victim's death. 195 Wn. 2d at 262-63. Grott was charged with first degree murder and seven counts of first degree assault, all arising out of the shooting. Grott did not deny the shooting but asserted that he acted in self-defense based on an incident months earlier when the victim had shot a gun into his house. *Id.* at 261-62, 264. The trial court gave self-defense and first aggressor instructions. On appeal, Grott challenged the propriety of the first aggressor jury instruction. The Washington Supreme Court stated that "where the defendant undisputedly engaged in a single aggressive act and that act was the sole basis for the charged offense, we agree that the single aggressive act cannot support a first aggressor instruction." *Id.* at 272. But it also said that this is not a "bright-line rule." *Id.* It held that when there is evidence that the defendant engaged in an aggressive course of conduct, rather than a single aggressive act, the provoking act can be part of a single course of conduct. *Id.* at 273.

The court held the first aggressor instruction was justified by witness testimony that although Grott began shooting before the victim even realized Grott was there, the victim's body was also found facing the defendant and in possession of a loaded gun with the safety off. *Id.* From this evidence, the jury could infer that, after Grott began shooting, the victim turned to face him, pulled out his own gun, leading Grott to continue shooting in self-defense. *Id.* In this scenario, the court concluded the jury was properly instructed that if Grott had provoked the need to defend himself by firing the first shots, then self-defense was not legally available to him. *Id.*

This case is analogous. The evidence demonstrates that while Muriithi confronted Kirumwa as he entered Gituma's home, he did not strike first. Kiruma struck Muriithi first by pummeling him with his fists. If the jury believed that Muriithi began to fight back and this led Kirumwa to continuing fighting in what he claimed to be self-defense, it could nonetheless conclude that Kirumwa provoked the need to defend himself by throwing the first punch. Thus, viewing the evidence in the light most favorable to the State, the evidence presented at trial was sufficient to support a first aggressor instruction.

C. ER 404(b)

Finally, Kirumwa argues that the trial court violated ER 404(b) in allowing the State to elicit testimony that Gituma feared Kirumwa. We reject this claim because no evidence of Kirumwa's prior misconduct was admitted at the trial which resulted in his conviction and evidence of Gituma's fear of Kirumwa was relevant in establishing the victim's state of mind at the time of the assault.

Under ER 404(b)

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before admitting evidence pursuant to ER 404(b), the trial court must

(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). When the admissibility of evidence is challenged under ER 404(b), we review a trial court's ruling for abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

Before Kirumwa's first trial, the State moved under ER 404(b) to admit evidence of prior domestic violence incidents between Kirumwa and Gituma. Specifically, the State wanted to elicit evidence that Kirumwa had (1) threatened to remove Gituma's uterus; (2) destroyed Gituma's property, including her television and her bathroom door; and (3) grabbed Gituma by the wrists and shoved her when she asked him to leave their home. Following an offer of proof, the trial court found by a preponderance of the evidence that each of these acts had occurred and further found that Gituma had disclosed these incidents to Muriithi. The court concluded that "this misconduct is admissible to show the victim's state of mind in this case, specifically that he was in reasonable

apprehension and imminent fear of bodily injury," an element of the charged crimes. Gituma testified to these incidents in her direct testimony.

But because Kirumwa moved for a mistrial before the first trial concluded, the jury that heard this evidence was discharged.

More than a year later, the parties proceeded to a second trial. The State again moved to admit the evidence of Kirumwa's threats and physical violence toward Gituma. The second trial court, however, concluded that while Gituma's fear and Muriithi's knowledge of it was admissible, the details of what Kirumwa had done were inadmissible. The trial court indicated that

> under [ER] 404(b), these things are not admissible, except to say the daughter had the guy there from the ADT folks because she was concerned about security of her home, and maybe specifically about the defendant. And that she communicated some of this to her father so he would appear there, without necessarily all the individual instances.

In accordance with this ruling, the State did not present evidence of Kirumwa's prior acts of violence toward Gituma at the second trial. Gituma testified that after Kirumwa moved out of the house, he retained keys to her home, took one of her cars and a remote control to the garage, and refused to return them to her. Gituma confirmed that during the six-week period before August 3, 2019, she and Kirumwa were "having issues," leading her to "have some concerns for [her] personal safety." She testified that her father had come to stay with her because she was severely anemic, needed his help to drive her to medical appointments, and had begun to feel unsafe around Kirumwa. She stated that initially, her mother and sister planned to come to Washington to help her but they changed the plan because she did not think "we were going to be safe." She further testified that the

ADT technician was present installing cameras because she was afraid of Kirumwa and did not want him back in the house. Muriithi testified, without objection, that Gituma had called him and told him about her personal safety concerns relating to Kirumwa.

Kirumwa challenges Gituma's limited testimony as a violation of ER 404(b). We disagree with this argument. First, none of the evidence of Kirumwa's threats, assaults, and destruction of property, the evidence identified as the State's proffered ER 404(b) evidence, was admitted at the trial in which he was convicted. Although the trial court allowed Gituma to testify that she had ended her relationship with Kirumwa, and had asked her father to help her get to medical appointments rather than her mother and sister, and hired ADT to install security cameras because she was afraid of Kirumwa, he does not demonstrate how this amounts to evidence of "prior bad acts" or "misconduct" by Kirumwa, as contemplated by ER 404(b).

ER 404(b) makes inadmissible "acts used to show the character of a person to prove that the person acted in conformity with it on a particular occasion." *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002). Evidence of Gituma's fear of Kirumwa is not evidence of any specific act on his part. Nor was this evidence admitted to show Kirumwa's propensity to engage in any such undisclosed behavior.

Instead, it was admitted to demonstrate Muriithi's state-of-mind at the time Kirumwa began his attack. Gituma's testimony that she feared Kirumwa and Muriithi's testimony that he was aware that she feared for her physical safety—

was relevant in establishing whether Muriithi had a reasonable apprehension of harm when Kirumwa assaulted him. Instruction no. 6 defined "assault" as including "an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." The jury was entitled to know what Muriithi knew at the time of the incident when determining if his fear of Kirumwa was reasonable. *See State v. Ragin*, 94 Wn. App. 407, 411-12, 972 P.2d 519 (1999) (a victim's knowledge of the defendant's prior violence is relevant to establish whether the victim's fear was reasonable); *State v. Barragan*, 102 Wn. App. 754, 759, 9 P.3d 942 (2000) (same); *State v. Magers*, 164 Wn.2d 174, 182-83, 189 P.3d 126 (2008) (same).

Kirumwa argues that the evidence should have been excluded because it was more prejudicial that it was probative. This analysis, though done in the context of an ER 404(b) objection, implicates ER 403. *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014). Under ER 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. "We review a trial court's evaluation of relevance under ER 401 and its balancing of probative value against its prejudicial effect . . . under ER 403 with a great deal of deference, using a 'manifest abuse of discretion' standard of review." *State v. Luvene*, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995).

The probative value of Gituma's testimony that she feared for her safety as a way to establish Muriithi's reasonable apprehension of harm is arguably minimal

considering the overwhelming evidence admitted at trial that demonstrates the reasonableness of his fear of Kirumwa. A jury could find that Muriithi was reasonably afraid based on Kirumwa's behavior on the day of the assault, including punching Muriithi, throwing kitchenware, and brandishing knives at him. Thus, Muriithi's knowledge that his daughter was afraid of Kirumwa before the assault occurred does appear to have limited value. And Kirumwa faced the potential prejudice that jurors would interpret Gituma's fear to indicate that Kirumwa had a propensity towards violence.

But we need not decide whether the court's ER 403 analysis was an abuse of discretion because any error would be harmless in light of the overwhelming evidence of the assault. When evidence is erroneously admitted in violation of ER 404(b), "we apply the nonconstitutional harmless error standard." *Gunderson*, 181 Wn.2d at 926. This requires us to decide whether there was a reasonable probability that the outcome of the trial could have been materially affected had the error not occurred. *Id.* (quoting *Gresham*, 173 Wn.2d at 433).

Here, there was ample evidence that Kirumwa assaulted Muriithi. Muriithi testified that Kirumwa struck him first when Muriithi tried to prevent Kirumwa from collecting his belongings. Both Muriithi and Gituma testified that Kirumwa threw the plate and cooking pot and that he brandished two knives at them, all while saying threatening things. Police identified Kirumwa's fingerprint on the handle of one of the knives, despite Kirumwa's testimony that he did not pick up a knife during the fight. And despite Kirumwa's testimony that Muriithi punched him, police testified that he had no visible injuries when they responded.

In light of this evidence, there is not a reasonable probability that evidence that Gituma was afraid of Kirumwa affected the verdict.

We affirm.

Andrus, C.J.

WE CONCUR:

Birk, J.

Smith, A.C.J.