

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE____FEB 1 0 2020

_Steven, C.J._
CHIEF JUSTICE

This opinion was
filed for record
at 8:00 a.m. on Feb. 20, 2020

for Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 97183-8 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| ROBERT DESHAWN GROTT, | ) | |
| | ) | Filed: __FEB 1 0 2020__ |
| Respondent. | ) | |

YU, J.— The issues in this case relate to a first aggressor instruction that was given at respondent Robert Grott's trial for a shooting incident in which Grott claimed that he acted in lawful self-defense. The instruction informed the jury that Grott could not claim self-defense if the jury found "beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight." Clerk's Papers (CP) at 1035. For the first time on appeal, Grott contended that this instruction was improperly given because

it was not supported by the evidence presented at trial. The Court of Appeals agreed and reversed Grott's convictions. We reverse the Court of Appeals.

As a threshold matter, we hold that RAP 2.5(a)(3) does not apply to Grott's unpreserved objection to the first aggressor instruction in this case, so he is not entitled to raise it for the first time on appeal. We nevertheless exercise our discretion to reach the issue because the law regarding first aggressor instructions requires some clarification. On the merits, we hold that the first aggressor instruction was properly given in this case and that Grott's trial counsel was not ineffective for failing to object. We therefore remand to the Court of Appeals to address the other issues raised on appeal.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. Factual background

This factual background is based on the evidence presented at trial. Where relevant to the issue of whether a first aggressor instruction was properly given, the evidence is presented in the light most favorable to the State. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005) (per curiam) (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)).

1. Events prior to the shooting

Grott is a former marine who was discharged in approximately December 2012. There was conflicting expert testimony as to whether he suffers from

2

posttraumatic stress disorder. Grott moved to the Tacoma area in January 2015, where he lived with his younger brother and two cousins.

Grott's brother and cousins were friends with Julian Thomas, and Thomas would sometimes spend the night at their house. In August 2015, one of Grott's handguns went missing. Grott and his brother came to believe that Thomas had stolen the gun, but they did not confront him about it. Thomas stopped coming by their house around that time.

On Halloween night in 2015, Grott came home intoxicated. Thomas's younger sister was there with some friends. Grott began yelling at Thomas's sister, accusing Thomas of stealing his gun and saying she came from a family of thieves. There was conflicting evidence as to whether Grott also threatened to kill Thomas and beat up his sister. Thomas's sister left with her friends.

A little while later, Grott and his brother went out their front door and saw a man standing at the end of the driveway. The man yelled at them and indicated he had a gun. Grott and his brother went back inside and closed the door. A moment later, a shot was fired through the front door, and the bullet nearly hit Grott in the head. Thomas took credit for the shooting. The police were never called.

After Halloween, Grott became "paranoid" and bought another gun. 12 Verbatim Report of Proceedings (VRP) (Apr. 12, 2017) at 1539. Thomas did not

3

directly contact Grott or his brother again, but there was conflicting evidence as to whether Thomas told others that he would kill Grott on sight.

2.    The day of the shooting

Shortly after noon on February 1, 2016, Thomas met his friend Petra Smith at an AMPM convenience store and gas station. Smith and Thomas arrived in separate cars, parked next to each other, and stood between the cars for a few minutes, talking and smoking. Smith then made a phone call.

While she was on the phone, Smith saw a man whom she did not know (later identified as Grott) arrive at a nearby bus stop on a skateboard. She testified that "as he stood at the bus stop, he was acting as though he was on some type of drug" and "kind of walking back and forth." 7 VRP (Apr. 4, 2017) at 793, 795. However, Smith did not pay much attention to him at the time. Thomas did not say anything about Grott to Smith, and Smith was not sure if Thomas had seen him. There is no evidence that Grott was out looking for Thomas, or vice versa.

Once Smith got off the phone, she turned her attention back to her conversation with Thomas. The two were still standing outside, to the driver's side of Thomas's car and to the passenger's side of Smith's car. Thomas then leaned into the driver's side of his car to look for loose change. Smith "told him he wasn't getting any. [They] laughed, and then he sat just inside of the front seat" of

his car, preparing to leave. *Id.* at 788. Smith leaned into Thomas's car to give him a hug.

Thomas had been "sitting in the car for maybe 30 seconds or less before the bullets hit." *Id.* Smith was still leaning over him, "still in the hug position." *Id.* at 789. The first few shots hit the convenience store behind the car, and Thomas leaned down in his seat, pulling Smith with him. He told Smith to stay down because "it was probably a drive-by and it would end. And then the bullets started hitting the car." *Id.* at 790.

Thomas "squeezed himself to the floor of the car," with "his head by the passenger seat" and his feet "by the gas pedal." *Id.* Smith could "hear somebody yelling that Jay [Thomas] wasn't going to get away with shooting at his house," and Thomas told Smith "to move because it didn't have nothing to do with [her]." *Id.* At that time, Thomas had not yet been hit by any shots.

Smith got out of the car and hid under another car nearby, where she could hear Grott shouting, reloading his gun, and continuing to shoot. Grott leaned over the top of a neighboring blue car, continuing to shoot at Thomas's car while "using the blue car for cover." 6 VRP (Apr. 3, 2017) at 700. Grott reloaded his gun several times, and "[i]n between reloads, he paused for quite a while, like he was — wanted to see if there was some reaction, or something." 11 VRP (Apr. 11,

5

2017) at 1356. The shooting lasted "a good four minutes." 6 VRP (Apr. 3, 2017) at 679.

When he was done shooting, Grott walked away. Smith crawled out from where she was hiding and saw Thomas on the floor of his car, "the way that [she] left him," except that "one leg was hanging out of the driver's door." 7 VRP (Apr. 4, 2017) at 804. Thomas was dead; he had been shot nine times.

The radio call to police went out at about 12:40 p.m. Forty-eight shell casings were collected at the scene. The medical examiner testified that based on Thomas's wounds, he must have been directly facing Grott, rather than lying on the car floor, at some point during the shooting. A loaded gun with the safety off was discovered beneath Thomas's body.

B.    Procedural history

Grott was charged by amended information with one count of first degree murder and seven counts of first degree assault. Grott did not deny that he had committed the shooting, but he asserted diminished capacity and self-defense. Only the self-defense claim is currently before this court.

Grott's proposed jury instructions included instructions on justifiable homicide and the lawful use of force in self-defense. Although the State objected to giving any instructions on self-defense, it proposed that if self-defense instructions were given, a first aggressor instruction should be given as well. The

6

court gave the self-defense instructions over the State's objection. It also gave a

first aggressor instruction without any objection by Grott. The first aggressor

instruction provided:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon [kill[1]] another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense to murder, manslaughter or assault.

CP at 1035.

In its closing argument, the State emphasized its theory that Grott shot

Thomas in retaliation, not self-defense, while the defense pointed to prior events

that made Grott "believe[ ] that he had no choice but to defend himself." 18 VRP

(Apr. 21, 2017) at 2287. The jury found Grott guilty of second degree murder and

seven counts of first degree assault, each with a firearm special verdict. Grott was

sentenced to a total term of confinement of 603 months.

Grott appealed, raising multiple issues. The Court of Appeals reversed on

the basis that the first aggressor instruction was not supported by the evidence and

therefore improperly "relieved the State of proving beyond a reasonable doubt that

---

[1] The word "kill" was included in the State's proposed first aggressor instruction. CP at 929. However, it was omitted from the court's instruction to the jury. *Id.* at 1035. The record does not indicate the reason for this omission. Grott does not contend that the omission rendered the instruction defective or that his trial counsel was ineffective for failing to object to it. Therefore, we leave to the Court of Appeals on remand the questions of whether and how this issue should be addressed.

7

Grott was not acting in self-defense." *State v. Grott*, No. 50415-4-II, slip op. at 9 (Wash. Ct. App. Mar. 5, 2019) (unpublished), http://www.courts.wa.gov/ opinions/pdf/D2%2050415-4-II%20Unpublished%20Opinion.pdf. However, the court concluded the evidence was sufficient to support the convictions and therefore remanded for further proceedings. *Id.* at 1, 12. It did not reach the other issues Grott raised on appeal. *Id.* at 1, 12 n.6.

The State petitioned for review, contending that the Court of Appeals should not have considered Grott's unpreserved objection to the first aggressor instruction and that the instruction was properly given. Grott opposed review, but he raised as a conditional issue that his trial counsel was ineffective for failing to object to the first aggressor instruction. We granted review of the State's petition and Grott's conditional issue. Order, No. 97183-8 (Wash. Sept. 4, 2019).

## ISSUES

A. Does Grott have the right to object to the first aggressor instruction for the first time on appeal pursuant to RAP 2.5(a)(3)?

B. Was the first aggressor instruction properly given?

C. Was trial counsel ineffective for failing to object to the first aggressor instruction?

ANALYSIS

The basic legal principles underlying self-defense and first aggressor instructions are settled. The use of force is lawful and justified where the defendant has a "subjective, reasonable belief of imminent harm from the victim." *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009). The amount of force used must be "not more than is necessary." RCW 9A.16.020(3).

"The evidence of self-defense must be assessed from the standpoint of the reasonably prudent person standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant sees." *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). If the defendant meets the "initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense," then the State has the burden to prove the absence of self-defense beyond a reasonable doubt. *Id.* at 909, 910 n.2; *see also State v. Acosta*, 101 Wn.2d 612, 616, 683 P.2d 1069 (1984).

"However, in general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation." *Riley*, 137 Wn.2d at 909. "[T]he reason one generally cannot claim self-defense when one is an aggressor is because 'the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must

9

be unlawful force, for self-defense.'" *Id.* at 911 (quoting 1 WAYNE R. LAFAVE &

AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.7(e), at 657-58 (1986)).

"[A]n aggressor instruction impacts a defendant's claim of self-defense," so

"courts should use care in giving an aggressor instruction." *Id.* at 910 n.2.

However, first aggressor instructions "should be given where called for by the

evidence." *Id.*

Against this backdrop, we now clarify several issues regarding first

aggressor instructions. First, not all erroneously given first aggressor instructions

are manifest errors affecting a constitutional right for purposes of RAP 2.5(a)(3).

Instead, unpreserved objections to first aggressor instructions must be evaluated on

a case-by-case basis to determine whether they may be raised for the first time on

appeal. In this case, the RAP 2.5(a)(3) criteria are not met.

Second, the question of whether a first aggressor instruction should be given

is a highly fact-specific inquiry, such that broad, bright-line rules are rarely

appropriate. Where, as here, the issue on appeal is whether the evidence was

sufficient to support giving a first aggressor instruction, appellate courts must

carefully consider the specific evidence presented at trial in the light most

favorable to the requesting party. Applying that standard, we hold that the

evidence in this case was sufficient to support giving a first aggressor instruction

and that trial counsel was not ineffective for failing to object.

A.    RAP 2.5(a)(3) does not apply to Grott's unpreserved objection to the first aggressor instruction

Grott's objection to the first aggressor instruction in this case was raised for the first time on appeal. He does not object to the wording of the instruction but to the fact that it was given at all, contending that it was not supported by the evidence presented at trial.

In general, parties must contemporaneously object to proposed jury instructions. CrR 6.15(c). However, RAP 2.5(a)(3) allows a party to object for the first time on appeal where there is a "manifest error affecting a constitutional right." Application of RAP 2.5(a)(3) depends on the answers to two questions: "(1) Has the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?" *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). In this case, the answer to both questions is no.

1.    Not all erroneously given first aggressor instructions are constitutional errors

We have previously observed that a first aggressor instruction "impacts a defendant's claim of self-defense." *Riley*, 137 Wn.2d at 910 n.2. However, this does not mean that all erroneously given first aggressor instructions are errors of constitutional magnitude. Instead, as with unpreserved objections to self-defense instructions, "[w]e look to the asserted claim and assess whether, if correct, it

11

implicates a constitutional interest as compared to another form of trial error."
*O'Hara*, 167 Wn.2d at 98. This evaluation must be done "on a case-by-case basis." *Id.* at 104.

"Jury instructional errors that we have held constituted manifest constitutional error include directing a verdict, shifting the burden of proof to the defendant, failing to define the 'beyond a reasonable doubt' standard, failing to require a unanimous verdict, and omitting an element of the crime charged." *Id.* at 100-01 (citations omitted); *see also Kalebaugh*, 183 Wn.2d at 584 (constitutional error in defining the reasonable doubt standard). The Court of Appeals here indicated that this standard is always met by an erroneously given first aggressor instruction because such instructions provide that "the jury does not have to consider whether the State has proved beyond a reasonable doubt that the defendant did not act in self-defense." *Grott*, No. 50415-4-II, slip op. at 5. This view of first aggressor instructions has been expressed in several opinions. *E.g.*, *State v. Bea*, 162 Wn. App. 570, 575-76, 254 P.3d 948 (2011); *State v. Stark*, 158 Wn. App. 952, 960-61, 244 P.3d 433 (2010).

We now clarify that first aggressor instructions are used to explain to the jury one way in which the State may *meet* its burden: by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense. *See Wingate*, 155 Wn.2d at 821; *Riley*, 137 Wn.2d at 909-10. Because first aggressor

instructions do not actually relieve the State of its burden of proof, erroneously given first aggressor instructions are not necessarily errors of constitutional magnitude.

In this case, the jury was instructed on self-defense and Grott was not prevented from arguing that theory of the case. The first aggressor instruction properly held the State to its burden of proof by requiring the jury to "find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight." CP at 1035. Thus, even if the first aggressor instruction was erroneously given, the error was not of constitutional magnitude.

2.   Not all constitutional errors are manifest

Turning to the second RAP 2.5(a)(3) question, the Court of Appeals indicated that the error was manifest because "[w]e presume that an error of constitutional magnitude is prejudicial, and the State bears the burden of proving that the error was harmless." *Grott*, No. 50415-4-II, slip op. at 6 (citing *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)). But that is the standard for harmless error, not manifest error. "Harmless error analysis occurs *after* the court determines the error is a manifest constitutional error and is a separate inquiry." *Kalebaugh*, 183 Wn.2d at 585; *see also O'Hara*, 167 Wn.2d at 99.

13

Manifest error requires "a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *O'Hara*, 167 Wn.2d at 99 (alteration in original) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *Id.* at 100.

In this case, the trial lasted nearly three weeks, and there was substantial, conflicting evidence about the precise timeline of the shooting and the events leading up to it. As discussed further below, some testimony indicated that there was a confrontation between Grott and Thomas on the day of the shooting, which Grott provoked by firing the first shots. There is thus no basis to conclude that the trial court should have sua sponte rejected the State's proposed first aggressor instruction. Giving the first aggressor instruction was therefore not manifest error and RAP 2.5(a)(3) does not apply.

B.     The first aggressor instruction in this case was properly given

Although Grott is not entitled to challenge the first aggressor instruction for the first time on appeal, "RAP 2.5(a) grants appellate courts discretion to accept review of claimed error not appealed as a matter of right." *State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). We exercise our discretion to reach the

14

other issues presented in order to further clarify the law governing first aggressor instructions. In light of these clarifications and the evidence presented at trial, we hold that there was sufficient evidence to support giving a first aggressor instruction in this case.

When this court reviews first aggressor instructions, we apply the same standards that we use to review other jury instructions. "'Jury instructions are sufficient if they permit each party to argue his theory of the case and properly inform the jury of the applicable law.'" *Riley*, 137 Wn.2d at 909 (quoting *State v. Bowerman*, 115 Wn.2d 794, 809, 802 P.2d 116 (1990)). "[W]hen determining if the evidence at trial was sufficient to support the giving of an instruction, the appellate court is to view the supporting evidence in the light most favorable to the party that requested the instruction." *Wingate*, 155 Wn.2d at 823 n.1 (citing *Fernandez-Medina*, 141 Wn.2d at 455-56). While we have cautioned that "courts should use care in giving an aggressor instruction," we have also recognized that "an aggressor instruction should be given where called for by the evidence." *Riley*, 137 Wn.2d at 910 n.2.

Nevertheless, some appellate opinions broadly state that "[a]ggressor instructions are not favored." *State v. Kidd*, 57 Wn. App. 95, 100, 786 P.2d 847 (1990); *see also State v. Sullivan*, 196 Wn. App. 277, 289, 383 P.3d 574 (2016); *State v. Birnel*, 89 Wn. App. 459, 473, 949 P.2d 433 (1998). This view appears to

originate from *State v. Arthur*, which held that a prior version of the pattern first aggressor instruction was "too vague and too broad." 42 Wn. App. 120, 124, 708 P.2d 1230 (1985). In a footnote, the *Arthur* court stated in dicta, "Few situations come to mind where the necessity for an aggressor instruction is warranted. The theories of the case can be sufficiently argued and understood by the jury without such instruction." *Id.* at 125 n.1. We acknowledged this dicta in *Riley*, but we nevertheless held that "an aggressor instruction should be given where called for by the evidence." *Riley*, 137 Wn.2d at 910 n.2.

This court has never held that first aggressor instructions are broadly disfavored, and we do not do so today. First aggressor instructions are disfavored only where they are not justified. To determine whether first aggressor instructions are justified, appellate courts should apply ordinary standards of review, which require a case-by-case inquiry based on the specific evidence produced at trial. *See Wingate*, 155 Wn.2d at 823 n.1; *Riley*, 137 Wn.2d at 909-10.

In contrast to the fact-specific inquiry required by our precedent, some opinions, including the Court of Appeals opinion in this case, have expressed a bright-line rule that the alleged act of first aggression cannot "be the actual assault" with which the defendant is charged. *Kidd*, 57 Wn. App. at 100; *see also Grott*, No. 50415-4-II, slip op. at 7; *Sullivan*, 196 Wn. App. at 290; *Bea*, 162 Wn. App. at 577. We have never explicitly adopted this bright-line rule, and while we do not

entirely reject it now, we do hold that it must be confined to its proper context. It cannot be applied in cases like this one, where the defendant engaged in a course of aggressive conduct, rather than a single aggressive act.

In cases where the defendant undisputedly engaged in a single aggressive act and that act was the sole basis for the charged offense, we agree that the single aggressive act cannot support a first aggressor instruction. One cannot simultaneously engage in an act of first aggression and an act of lawful self-defense because an act of first aggression is an "intentional act reasonably likely to provoke a belligerent response" *by* the victim, while lawful self-defense requires a "subjective, reasonable belief of imminent harm *from* the victim." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 256 (4th ed. 2016); *LeFaber*, 128 Wn.2d at 899 (emphasis added). Thus, where a defendant who is charged for firing a single shot claims self-defense, that shot cannot, in itself, support a first aggressor instruction. *State v. Wasson*, 54 Wn. App. 156, 159, 772 P.2d 1039 (1989); *State v. Upton*, 16 Wn. App. 195, 197, 204, 556 P.2d 239 (1976). Likewise, where the defendant is charged for making a single threat with a gun, that threat cannot support a first aggressor instruction. *State v. Brower*, 43 Wn. App. 893, 896, 902, 721 P.2d 12 (1986).

However, in most cases, the facts are more complicated and bright-line rules are not appropriate. For instance, in *State v. Hughes*, the defendant was charged

with murder and assault based on a "7-minute gun battle" in which the defendant killed one police officer and wounded another. 106 Wn.2d 176, 178-79, 721 P.2d 902 (1986). The defendant "testified that he shot the officers in self-defense, thinking that the two had a contract on his life because of a drug deal." *Id.* at 179. On direct review, this court affirmed that a first aggressor instruction "was properly given to the jury since there was evidence that the defendant shot first when the officers attempted to arrest him." *Id.* at 191. Similarly, in *State v. Gregory*, we held a first aggressor instruction was proper where the defendant shot "a Seattle taxicab driver during the course of a vicious gunfight" and the driver suffered "five gunshot wounds—the last four of which were subsequently determined to have been fatal." 79 Wn.2d 637, 638, 488 P.2d 757 (1971), *abrogated on other grounds by State v. Rogers*, 83 Wn.2d 553, 520 P.2d 159 (1974). Thus, where there is evidence that the defendant engaged in a course of aggressive conduct, rather than a single aggressive act, "the provoking act *can* be part of a 'single course of conduct.'" *Sullivan*, 196 Wn. App. at 290 (emphasis added).

In this case, the Court of Appeals applied the bright-line rule that an alleged act of first aggression cannot be part of the charged conduct, reasoning that every shot Grott fired was "part of the actual charged incident to which self-defense is claimed," so in order "[t]o support a first aggressor instruction the evidence would

have to show that Grott made an intentional act *before* the shooting." *Grott*, No. 50415-4-II, slip op. at 7. However, Grott engaged in a course of aggressive conduct, firing 48 shots over the course of several minutes and pausing to reload multiple times. We therefore must conduct a fact-specific inquiry in which we "view the supporting evidence in the light most favorable to the party that requested the instruction" to determine if the evidence was sufficient to support a first aggressor instruction. *Wingate*, 155 Wn.2d at 823 n.1. That standard is met here because "there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." *Riley*, 137 Wn.2d at 909.

Smith testified that Grott fired several shots before Thomas even realized Grott was there. However, the medical examiner testified that Thomas was directly facing Grott at some point during the shooting, and Thomas was found with a loaded gun with the safety off. From this, the jury could reasonably infer that sometime after Grott began shooting, Thomas turned to face Grott and pulled out his own gun. The jury could therefore conclude that once Thomas pulled out his gun, Grott had a reasonable fear of imminent harm and continued shooting in self-defense, ultimately killing Thomas. But if Grott provoked the need to defend himself by firing the first shots, then self-defense was not legally available to him. The jury was appropriately instructed accordingly.

We therefore reverse the Court of Appeals and hold that the first aggressor instruction in this case was properly given.

C.    Trial counsel was not ineffective for failing to object to the first aggressor instruction

Finally, Grott contends that his trial counsel was ineffective for failing to object to the first aggressor instruction. Ineffective assistance claims are reviewed de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) defense counsel's representation was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant." *Id.* In this case, Grott cannot show prejudice because the first aggressor instruction was supported by the evidence presented at trial, so any objection would have been properly overruled. *See State v. McFarland*, 127 Wn.2d 322, 337 n.4, 899 P.2d 1251 (1995). Grott therefore does not show that his trial counsel was ineffective.

## CONCLUSION

We hold that erroneously given first aggressor instructions are not necessarily constitutional errors, and reaffirm that constitutional errors are not necessarily manifest. In this case, giving a first aggressor instruction was not a manifest constitutional error, so Grott does not have the right to raise an objection for the first time on appeal.

20

We nevertheless reach the merits of Grott's objection to clarify that first aggressor instructions are reviewed according to ordinary standards of appellate review. The inquiry must be fact specific and based on the evidence presented at trial, so broad, bright-line rules are rarely appropriate. In this case, the first aggressor instruction was properly given and trial counsel was not ineffective for failing to object. We therefore reverse and remand to the Court of Appeals to consider the other issues on appeal. RAP 13.7(b); *Wingate*, 155 Wn.2d at 823-24.

_____
Ju, J

WE CONCUR:

_____
Stephens, C.J

_____
Johnson

_____
Madsen, J.

_____
Owens, J.

_____
Wiggins, J.

_____
González, J.

_____
Geo McCloud, Jr.

_____
Fairhurst, J.P.T.

22