IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39033-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEB MATTHEW STEELE, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Jeb Matthew Steele appeals his conviction for fourth degree assault, arguing the trial court erroneously issued an initial aggressor instruction. We disagree and affirm.

FACTS

Jeb Steele always accompanied his girlfriend to her pain management appointments at Lynx Healthcare in Spokane Valley. The appointment on August 2, 2021, was different, because the girlfriend's treatment provider, Christian Garrido, requested to see the girlfriend alone and directed Mr. Steele to wait in the lobby. Mr. Garrido, a physician assistant, explained that due to COVID concerns he wanted to minimize foot traffic in the back of the clinic, and he also wanted to see how well the girlfriend could walk on her own.

After speaking with the girlfriend, Mr. Garrido went back to the lobby, joined by a medical assistant. Mr. Garrido asked Mr. Steele to hand over the girlfriend's purse, leave the waiting room, and follow him outside. Mr. Steele complied. Outside the clinic, Mr. Garrido blocked the exterior doors and informed Mr. Steele that his girlfriend would not be leaving with him, and that Mr. Steele needed to leave the premises without her. Mr. Steele demanded to speak to his girlfriend and a physical altercation ensued. Mr. Steele slapped Mr. Garrido's extended arm, pushed past Mr. Garrido into the foyer, and both men later testified that they "wrestled" with each other. 1 Rep. of Proc. (RP) (May 24, 2022) at 161; 1 RP (May 25, 2022) at 229.

As the struggle continued and other employees became involved, the medical assistant dialed 911. Law enforcement arrived, and Mr. Steele was arrested. Mr. Garrido escorted the girlfriend out the building through a backdoor and she was picked up by her sister.

The State charged Mr. Steele with two counts of fourth degree assault: one against Mr. Garrido and one against the medical assistant. Mr. Steele pleaded not guilty and the case proceeded to a jury trial.

The State's first witness was Mr. Garrido, who testified he had been treating Mr. Steele's girlfriend for chronic pain for over a year at the time of the incident. Mr. Garrido

explained he asked Mr. Steele to leave because his girlfriend stated she did not want

depart with him. Mr. Garrido described how his altercation with Mr. Steele became

physical while they stood in front of Lynx Healthcare's exterior doors:

> We were facing face to face. . . .
> . . . .
>     After I spoke to him, he struck my left arm and attempted to enter the building. . . .
> . . . .
> [H]e . . . proceeded to try to push past me to enter those two doors.
> . . . .
>     We pushed back and forth to each other. At one point he put his hand up to my throat in order to push me to the side, so just open palm to my throat to push me to the side. He did slip around me and go past those two double doors. I followed right behind him and blocked his entrance through the next set of double doors.

1 RP (May 24, 2022) at 158-59.

    Mr. Garrido testified Mr. Steele made threats, including asking Mr. Garrido,

"'Do you want to die today?'" *Id*. at 160. According to Mr. Garrido, multiple coworkers

intervened and tried to pull Mr. Steele off him. Mr. Garrido and Mr. Steele "wrestled

back and forth," and Mr. Garrido feared for the safety of others in the waiting area and

Mr. Steel's girlfriend. *Id*. at 161. Mr. Garrido recalled Mr. Steele grabbing his neck at

several points during the altercation, each time causing a momentary inability to breathe.

Mr. Garrido claimed he did not make any movement toward Mr. Steele before being

struck. On cross-examination, Mr. Garrido agreed that physical contact ensued when he used his body to block Mr. Steele's attempts to reenter the building.

The medical assistant testified he observed Mr. Steele place his hands around Mr. Garrido's throat and shove Mr. Garrido against the doors, all while asking Mr. Garrido if he wanted to die and demanding to speak with the girlfriend. He testified he did not see Mr. Garrido make any movement toward Mr. Steele before Mr. Steele struck Mr. Garrido. The medical assistant recalled being struck in the neck with a closed hand by Mr. Steele. He testified that, at the time of the incident, Lynx Healthcare had a surveillance camera stationed behind the front desk in the lobby. The camera faced the front doors.

Footage from this camera was admitted into evidence and shown to the jury. The surveillance camera captured the onset of the incident from a considerable distance, but Mr. Garrido can be seen just outside the lobby doors blocking Mr. Steele's entrance with his arms folded, and Mr. Steele can be seen lunging toward Mr. Garrido and slapping Mr. Garrido's arm. The State also called another Lynx employee and the responding deputy before resting its case.

Mr. Steele testified on his own behalf. Mr. Steele explained he and his girlfriend had been dating for about four years at the time of the incident and they lived together.

According to Mr. Steele, when Mr. Garrido and the medical assistant came out to retrieve his girlfriend's purse, Mr. Garrido told him his girlfriend was breaking up with him. Mr. Steele responded he wanted to "'hear it from her mouth'" before he would leave. 1 RP (May 25, 2022) at 228. Mr. Steele explained he tried to reenter the building, "[a]nd as I grabbed the door, [Mr. Garrido] came at me and I just kinda shoved him and pushed him down to the side and I walked into the foyer part of the thing. And I think he came from behind me, and we kind of tackled and wrestled." *Id.* at 229. On cross-examination, Mr. Steele claimed that if he had touched Mr. Garrido's neck, it was not intentional.

Mr. Steele's girlfriend testified for the defense. She claimed Mr. Garrido forbade her from leaving with Mr. Steele because he had noticed drastic changes in her health that worried him. She testified she did not understand why Mr. Garrido was not letting her see Mr. Steele. On cross-examination, she admitted that, as she left Lynx Healthcare in her sister's vehicle, she saw Mr. Steele being put into a police vehicle and she made no effort to intervene, to speak to Mr. Steele, or to give a statement to the authorities.

On rebuttal, the State recalled Mr. Garrido. Mr. Garrido reiterated Mr. Steele's girlfriend had told him she did not wish to depart with Mr. Steele. He denied forbidding the girlfriend from leaving with Mr. Steele or telling Mr. Steele that his girlfriend was

5

breaking up with him. All Mr. Garrido told Mr. Steele was his girlfriend would not be

leaving with him that day, which provoked Mr. Steele's anger.

After the close of the evidence, the court held a jury instruction conference. The

court issued a self-defense instruction over the State's objection. The court also issued an

initial aggressor instruction over the objection of the defense. In granting the instructions,

the court noted the grounds for each were "quite borderline." 1 RP (May 26, 2022) at

290-91. The court noted it was difficult to assess the timeline of the altercation because

"Mr. Garrido's testimony . . . wasn't consecutive. . . . [H]e jumped around in his

testimony." *Id*. at 286. But ultimately, the trial court agreed to give a first aggressor

instruction, explaining:

> So this is definitely a course of conduct. This is not a one-instance
> sort of situation, [where] a first aggressor instruction would not be
> appropriate. . . . [A]t this point, it's up to the jury to decide. And a first
> aggressor instruction is appropriate based on the testimony that Mr. Garrido
> presented.
>  . . . .
> The [surveillance] video is highly inconclusive, and I don't think
> that, from the Court's perspective, that doesn't support either party's
> position. From the court's perspective, again, at this stage, I have to
> consider the evidence in a light most favorable to the State, so when I
> consider the testimony and the video, a first aggressor instruction is
> appropriate.
> So, again, when I look at that testimony . . . Mr. Steele was allegedly
> making these comments that what would happen if Mr. Garrido did not get
> out of his way. And Mr. Garrido blocked him from going into the doors,
> and Mr. Steele swatted his hand, and it didn't end there. It wasn't a one-

instance situation. This was a course of conduct where then he allegedly put his hand to Mr. Garrido's throat and wrestled back and forth.

So I do find that if the self-defense instruction is going to be given under these specific facts, that a first aggressor instruction is also appropriate.

*Id*. at 287, 290-91.

The jury convicted Mr. Steele of fourth degree assault against Mr. Garrido, but acquitted him of fourth degree assault against the medical assistant. The trial court entered judgment against Mr. Steele and sentenced him to 14 days in jail. Mr. Steele appeals.

ANALYSIS

Mr. Steele's sole argument on appeal is that the trial evidence did not warrant issuance of an initial aggressor instruction.

This court reviews de novo whether sufficient evidence justified a trial court's decision to give an aggressor instruction. *State v. Stark*, 158 Wn. App. 952, 959, 244 P.3d 433 (2010). To justify the instruction, the State needed to produce some evidence showing Mr. Steele was the aggressor. *See State v. Bea*, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). An initial aggressor instruction is proper where there is credible evidence on which a reasonable juror could rely in concluding the defendant was the aggressor. *State v. Sullivan*, 196 Wn. App. 277, 289, 383 P.3d 574 (2016). Such an

instruction is also appropriate "if there is conflicting evidence" as to the identity of the first aggressor. *See State v. Riley*, 137 Wn.2d 904, 910, 976 P.2d 624 (1999). We analyze the evidence supporting the instruction in the light most favorable to the party that requested the instruction—here, the State. *See State v. Grott*, 195 Wn.2d 256, 270, 458 P.3d 750 (2020).

Here, the initial aggressor instruction was supported by credible evidence. Mr. Garrido testified that his altercation with Mr. Steele began when Mr. Garrido extended his left arm and "ask[ed] [Mr. Steele] not to come in," and that "[a]fter I spoke to him, [Mr. Steele] struck my left arm." 1 RP (May 24, 2022) at 159. When the trial prosecutor asked Mr. Garrido if he made "any movement[] toward[] [Mr. Steele] before he struck you," Mr. Garrido responded, "I did not." *Id.* at 164. Similarly, the medical assistant testified he did not see Mr. Garrido make any movement toward Mr. Steele before Mr. Steele physically lashed out. A jury could therefore "reasonably determine" that Mr. Steele "provoked the fight." *Stark*, 158 Wn. App. at 959.

The fact that the video evidence was arguably inconclusive and that Mr. Steele's testimony partially contradicted Mr. Garrido's version of events does not undermine the propriety of the instruction. As previously stated, our standard of review requires us to review the evidence in the light most favorable to the State, the party that requested the

instruction. It was the jury's role to weigh conflicts in testimony and the persuasiveness of the parties' cases. *See State v. Bass*, 18 Wn. App. 2d 760, 782, 491 P.3d 988 (2021).

Despite the conflicting evidence, on appeal, Mr. Steele argues that the trial court should have nevertheless refrained from giving a first aggressor instruction because he "engaged in a single aggressive act" which "was the sole basis for the charged offense." *Grott*, 195 Wn.2d at 272. In such a situation, first aggressor instructions are disapproved. *See id*.

By way of context for this argument, prior to 2020, several opinions of this court applied a bright-line rule, holding that trial courts were prohibited from giving a first aggressor instruction if the defendant's purportedly provocative act was the charged assault itself. *See State v. Kidd*, 57 Wn. App. 95, 100, 786 P.2d 847 (1990); *Bea*, 162 Wn. App. at 577; *Sullivan*, 196 Wn. App. at 290.

But in *Grott*, our Supreme Court intervened:

> We have never explicitly adopted this bright-line rule, and while we do not entirely reject it now, we do hold that it must be confined to its proper context. It cannot be applied in cases like this one, where the defendant engaged in *a course of aggressive conduct, rather than a single aggressive act*.

195 Wn.2d at 271 (emphasis added).

In *Grott*, the Court concluded the defendant had "engaged in a course of aggressive conduct" because he "fir[ed] 48 shots over the course of several minutes." *Id*. at 273. Where there is evidence that a defendant engaged in such a course of aggressive conduct, the State *may* point to that course of conduct as the purported provocation of a victim's need to defend themself. *See id*. By contrast, the Court differentiated *Grott*'s facts from a case "where a defendant . . . is charged for firing a single shot [and] claims self-defense." *Id*. at 272. In such a scenario, "that shot cannot, in itself, support a first aggressor instruction." *Id*. The Court noted that the former situation—a continuous course of aggressive conduct—is, practically speaking, more common than the latter: "[I]n most cases, the facts are more complicated [than a single aggressive act] and bright-line rules are not appropriate." *Id*.

Here, contrary to Mr. Steele's contentions, the record does not indicate he engaged in a single aggressive act. The surveillance video itself—incomplete as it is—reveals at least two aggressive acts: it shows (1) Mr. Steele lunging toward Mr. Garrido, and (2) Mr. Steele slapping Mr. Garrido's arm. *See* Ex. P-6 at 1 min., 54 sec. In addition, Mr. Garrido and the medical assistant both testified that Mr. Steele grabbed Mr. Garrido's throat, shoved Mr. Garrido, and made verbal threats. The bright-line rule disfavoring first aggressor instructions, that Mr. Steele now asks this court to follow, applies only "where

the defendant *undisputedly* engaged in a single aggressive act." *Grott*, 195 Wn.2d at 272 (emphasis added). In reality, the record indicates Mr. Steele engaged in a continuous course of aggressive conduct that precipitated a fight with Mr. Garrido. In these circumstances, the trial court properly granted the State's request for a first aggressor instruction.

## CONCLUSION

The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Staab, J.

11