# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57813-1-II |
| Respondent, | |
| v. | |
| COURTNEY HUMPHREY FELTON, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Courtney H. Felton appeals his conviction for second degree assault arguing that the trial court erred by refusing to give jury instructions on self-defense and defense of others.[1] Felton also argues that the trial court erred by imposing a $500 crime victim penalty assessment (VPA) and a $100 DNA collection fee as part of his sentence. We conclude the trial court erred by failing to give proper jury instructions on self-defense but the error was harmless. The superior court did not err by refusing to give a jury instruction on defense of others. Accordingly, we affirm Felton's second degree assault conviction but remand to the trial court to strike the legal financial obligations (LFOs) that are no longer authorized by the legislature.

FACTS

In the early morning hours of May 10, 2021, Felton broke into a townhouse where Michael Taylor and Shanerica Carter lived. Felton was with his sister, Samantha Felton, and Samantha's[2]

---

[1] Felton was also convicted of first degree burglary, but he does not appeal his first degree burglary conviction.

[2] We refer to Samantha by her first name to avoid confusion. We mean no disrespect.

adult daughter, Shavante Duke. Felton beat up Taylor while inside the townhouse. The State charged Felton with first degree burglary and second degree assault. The case proceeded to a jury trial.

Carter, Taylor, and several responding officers testified at trial. The parties had a long-established relationship because Carter and Samantha had been friends for many years. Samantha was god mother to Carter's daughter and Carter was close to all of Samantha's children. However, after Carter met Taylor, her relationship with Samantha began to deteriorate. Despite this, Samantha continued to have a good relationship with Carter's daughter.

As for the specific events on May 10, Carter testified that in the early morning hours, she was awoken by Samantha throwing glass bottles at the windows of her townhouse. After Carter woke up Taylor, the two headed down their stairs to the first floor. At that moment, Felton, Samantha, and Duke kicked in the front door. The kick broke the deadbolt and the door frame came off.

Carter testified that Felton was the first person through the broken door. He first went into the garage for a few seconds, but then started up the stairs to confront Taylor and Carter. Carter testified that Felton and Duke began punching and kicking Taylor. Duke was also hitting Taylor with a sharp metal shelving bracket. When Carter tried to help Taylor, Duke pushed her back up the stairs and onto the floor.

Taylor testified that Carter woke him up in the early morning hours because she heard a noise outside. Taylor looked out the window and saw Samantha and Duke outside. Then Taylor called 911. While Taylor was on the phone with 911, he heard banging on the front door. As Taylor began going down the stairs, "the door busted open." 4 Verbatim Rep. of Proc. (VRP)

at 323. Felton then approached Taylor on the stairs, grabbed him by the shirt, and said, "Let's go." 4 VRP at 324. Taylor testified that he thought he was going to be killed, so he hit Felton. Taylor and Felton "got into a tussle," with Taylor ending up on the floor. While Taylor was on the floor, Felton kept repeatedly punching Taylor. Taylor believed other people were hitting him as well.

On cross-examination, Taylor was asked if he got between Carter and Duke at any time during the incident. Taylor responded no, but that he had gotten between them during an earlier incident that occurred prior to May 10. Taylor was asked again if he had told the police that he jumped between Duke and Carter when they arrived after the May 10 incident. Taylor again said he was referring to the prior incident.

Officer Cory Correia, who responded to the townhouse on the early morning of May 10, also testified. On cross-examination, Officer Correia testified that Taylor had told him that morning that Duke was screaming at Carter and pushed Carter to the ground, which caused Taylor to intervene by jumping between them.

There was some dispute at trial about why Samantha, Felton, and Duke were at the townhouse on May 10—specifically, whether they were looking for Samantha's son, Aviontay. Aviontay was around 21 years old in May 2021. Aviontay was cared for by Samantha because he had special needs related to seizures.

A few months before the May 10 incident, Aviontay had run away from Samantha's home and gone to Carter's townhouse. When Aviontay arrived, Carter called Samantha, who then came and got him.

During trial, Carter maintained that she did not have any information that Samantha, Felton, and Duke were looking for Aviontay, although she did testify Duke asked where her

brother was when she came into the townhouse. On cross-examination, Carter was asked about several previous statements she had made that indicated Samantha and Duke were looking for Aviontay.

Felton did not testify at trial.

Felton proposed a self-defense jury instruction for the second degree assault count. Felton's proposed instruction stated, in relevant part:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

Clerk's Papers at 124.

In the discussion with the trial court, Felton asserted there was evidence presented at trial supporting both self-defense and the defense of others:

> [FELTON]: Like Mr. Taylor saying he threw the first punch.
>
> [COURT]: After his door was kicked in and people came charging up the stairs.
>
> [FELTON]: Well, that's his argument but --
>
> [COURT]: That's not just the argument. That's supported by both direct and circumstantial evidence.
>
> [FELTON]: There is evidence for that. I'm not arguing like that is what [Taylor] said happened, but he says that he threw the first punch, that Mr. Felton -- the evidence shows that Samantha and [Duke] were the two people outside doing things and that's what he was concerned about. He says he threw the first punch, and that should create a situation of self-defense with Mr. Felton.
>
> Also, [Taylor] denied having said it to the officer, but the officer wrote in his report and was refreshed -- his recollection was refreshed that in the moment after -- when the first Officer Correia arrived and was talking to Mr. Taylor about what happened, before he had a chance to get his story straight, he said that he jumped -- that Mr. Taylor jumped between the two women who were screaming at each other, and Ms.

> Duke was screaming at his girlfriend, and he inserted himself between them and intervened, and then Mr. Felton removed Mr. Taylor from that situation, and so it's reasonable to think that -- well, an argument can be made that defense of others, that Mr. Felton was protecting his niece and sister from Mr. Taylor and the others inside that apartment.

5 VRP at 489-90.

The State argued that Felton was not entitled to claim self-defense because he was the aggressor when he grabbed Taylor before Taylor punched him.

The trial court rejected the proposed self-defense instruction. The trial court noted that self-defense is based on a person's right to defend themselves from an unwarranted attack but "[w]hen you break into somebody's house by kicking the door in in the middle of the night, you are not being subjected to an unwarranted attack." 5 VRP at 490. Thus, the trial court determined that Felton's proposed instruction was "unwarranted under the facts." 5 VRP at 491.

In closing argument, Felton's defense counsel argued that the growing split between Carter and Samantha provided the context for Carter's and Taylor's reactions to the incident on May 10. However, defense counsel contended there was no evidence that Felton knew anything about this ongoing and growing dispute between Carter and Samantha. Further, defense counsel argued that this dispute resulted in Taylor "ready for a fight" on the day of the incident, but Felton was only involved because he was looking for Aviontay. 6 VRP at 574.

Defense counsel also argued that there was no sinister motivation behind throwing beer bottles at the townhouse. Instead, they were only trying to wake up Carter and Taylor so they could find Aviontay.

As for the entry into the townhouse, defense counsel suggested that the door may not have been kicked in at all because there was no reliable evidence of the door being kicked in. Defense counsel claimed there was no evidence that Felton, personally, broke down the door or knew that Samantha and Duke may have entered the townhouse unlawfully.

Finally, defense counsel argued that Taylor misinterpreted Felton's "[l]et's go" statement because Taylor was on "heightened alert" and expecting a fight. 6 VRP at 585. Defense counsel argued that there was another way to interpret the statement:

> A person can say, "Let's go," to someone in the context that Mr. Taylor took it through his already heightened alert lens, or it can mean: "All right, buddy. Let's go. Let's get out of this situation. I'm pulling you out of here. You're fighting with my niece."

6 VRP at 585.

The jury found Felton guilty of first degree burglary and second degree assault. The trial court imposed a standard range sentence of 42 months' total confinement. The trial court found Felton was indigent and imposed the $500 VPA and $100 DNA collection fee.

Felton appeals.

ANALYSIS

Felton argues that the trial court erred by denying his proposed jury instructions on self-defense and defense of others. Felton also argues that the VPA and DNA collection fee should be stricken from his judgment and sentence because they are no longer authorized by statute. We affirm Felton's second degree assault conviction but remand to the trial court to strike the VPA and DNA collection fee.

I. JURY INSTRUCTIONS

" 'Jury instructions are sufficient if they permit each party to argue his theory of the case and properly inform the jury of the applicable law.' " *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999) (quoting *State v. Bowerman*, 115 Wn.2d 794, 809, 802 P.2d 116 (1990)). We review whether there is sufficient evidence to support a lawful use of force instruction de novo. *State v. Fisher*, 185 Wn.2d 836, 849, 374 P.3d 1185 (2016).

A. SELF-DEFENSE

Felton argues that the trial court erred by denying his proposed jury instruction on self-defense because there was "some evidence" that he had an objective and subjective belief that he was going to suffer imminent harm. Br. of Appellant at 15. The State argues Felton was not entitled to self-defense because he was the aggressor.

We agree with Felton that, under these facts, the trial court should have given a self-defense instruction, although the State was also entitled to a first aggressor instruction. However, the trial court's error was harmless.

"The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm from the victim.' " *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009)). "To raise self-defense before a jury, a defendant bears the initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense, i.e., the statutory elements of reasonable apprehension of great bodily harm and imminent danger." *Riley*, 137 Wn.2d at 909. " 'The evidence of self-defense must be assessed from the standpoint of the reasonably prudent person

standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant sees.' " *Grott*, 195 Wn.2d at 266 (quoting *Riley*, 137 Wn.2d at 909). Once the defendant meets the initial burden of producing some evidence that his actions occurred in circumstances amounting to self-defense, the burden shifts to the State to prove the absence of self-defense beyond a reasonable doubt. *Id.*

" 'However, in general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation.' " *Id.* (quoting *Riley*, 137 Wn.2d at 909). Because a first aggressor instruction " 'impacts a defendant's claim of self-defense,' " trial courts " 'should use care' " when deciding to give a first aggressor instruction. *Id.* (quoting *Riley*, 137 Wn.2d at 910 n.2). "However, first aggressor instructions 'should be given where called for by the evidence.' " *Id.* (quoting *Riley*, 137 Wn.2d at 910 n.2). A first aggressor instruction is appropriate "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense" or "if there is conflicting evidence as to whether the defendant's conduct precipitated a fight." *Riley*, 137 Wn.2d at 909-10. "[W]hether a first aggressor instruction should be given is a highly fact-specific inquiry" and the evidence supporting a first aggressor instruction must be carefully considered in the light most favorable to the requesting party. *Grott*, 195 Wn.2d at 267.

Here, Felton presented "some evidence" supporting his claim of self-defense. Taylor testified that he punched Felton in the face before Felton began punching him. Because Taylor admitted that he punched Felton first, there was some evidence that Felton had a subjective, reasonable belief he would suffer imminent harm. *Grott*, 195 Wn.2d at 266; *Riley*, 137 Wn.2d at 909. Felton was entitled to a self-defense instruction that would have allowed him to argue his

theory of the case regarding the second degree assault charge—specifically that the group only entered the house to look for Aviontay and, because of their preexisting relationships, the group did not give Taylor or Carter a reason to fear imminent harm so he was only acting in self-defense when he responded to Taylor's punch.

Of course, there was credible evidence that Felton was the aggressor. Carter and Taylor both testified that Samantha and Duke were throwing bottles at their townhouse and that the door to the townhouse was kicked in—all during the early morning hours when Carter and Taylor were asleep. And given the time of the day and loud, destructive commotion of breaking beer bottles, Taylor immediately called 911. Further, Taylor testified that he only punched Felton after Felton confronted him on the stairs, grabbed his shirt, and said, "Let's go." Under these facts, the State would have been entitled to a first aggressor instruction.

However, just because the State was clearly entitled to a first aggressor instruction, Felton is not precluded from obtaining a jury instruction on self-defense. *See Riley*, 137 Wn.2d at 910; *Grott*, 195 Wn.2d at 267.[3] Providing a first aggressor instruction along with Felton's proposed self-defense instruction would have properly allowed both parties to argue their theories of the

---

[3] The State relies heavily on *State v. Craig*, 82 Wn.2d 777, 784, 514 P.2d 151 (1973), in which our Supreme Court held that the defendant was not entitled to a jury instruction on self-defense because the defendant "admittedly engaged in conduct which gave the victim good cause to believe that he was threatened with bodily harm." *Craig* is distinguishable because, there, the defendant admitted to the conduct, whereas here, the context and specific conduct leading up to the assault was contested.

Further, *Craig* was decided in 1973, without the benefit of the more recent case law indicating that where there is evidence that the defendant was the aggressor, it is appropriate to give a first aggressor instruction together with a self-defense instruction, rather than to deny a requested self-defense instruction in the first place. *See Riley*, 137 Wn.2d at 910; *Grott*, 195 Wn.2d at 267.

case. The jury instructions given in this case did not allow Felton to argue his theory of the case. Therefore, the superior court erred by failing to properly instruct the jury on self-defense.

However, the failure to give an instruction can be harmless. " 'An erroneous instruction is harmless if, from the record in [the] case, it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State v. Carter*, 154 Wn.2d 71, 81, 109 P.3d 823 (2005) (alteration in original) (quoting *State v. Brown*, 147 Wn.2d 330, 332, 58 P.3d 889 (2002)).

Here, there was undisputed evidence that Felton, Samantha, and Duke entered the townhouse unexpectedly and without permission, in the middle of the night, after throwing beer bottles at the house. Even though there was some evidence to support Felton's theory that they were at the house looking for Aviontay, none of the three attempted to communicate to Carter or Taylor before arriving at the house. Similarly, the only evidence actually presented—Taylor's testimony—was that after the group's uninvited, late-night entry, Felton grabbed Taylor first and made an arguably threatening statement of "[l]et's go," all before any punches were thrown. Based on all the evidence presented at trial, we are convinced beyond a reasonable doubt that the failure to instruct the jury on self-defense (with a companion first aggressor instruction) did not contribute to the verdict. No reasonable juror would have found that Felton was not the aggressor. Although the trial court should have given complete instructions on self-defense, we conclude the error was harmless. Accordingly, we affirm Felton's second degree assault conviction.

B.  DEFENSE OF OTHERS

Felton also argues that the trial court erred by refusing to instruct the jury on the lawful use of force in defense of others.  We disagree.

A defendant's use of force is justifiable to protect a third party from injury when: (1) the defendant would be justified in using force to defend himself or herself against the same injury being threatened against the third party, (2) under the circumstances as understood by the defendant, the third party would be justified in using force to protect himself or herself, and (3) the defendant believes that the intervention is necessary to protect the third party.  *State v. Penn*, 89 Wn.2d 63, 66, 568 P.2d 797 (1977).  Further, the defendant's apprehension of danger must be reasonable under the circumstances.  *Id.*

Here, the only evidence Felton argues supports his defense of others instruction was Officer Correia's testimony that Taylor had said on the night of the incident that he jumped between Duke and Carter after Duke had been screaming at Carter and pushed Carter to the ground.  Even assuming this statement is true, a defense of others instruction would have been inappropriate.  Duke would not have been justified in using force to protect herself from Taylor because Duke, herself, was the aggressor who pushed Carter to the ground.  Further, neither Samantha, Duke, nor Felton testified, and there was no other evidence that Felton had a reasonable apprehension of danger to Duke.  Taylor's alleged statement (to Officer Correia) that he jumped between Duke and Carter only suggests that Taylor may have physically put himself in between Duke and Carter.  But it falls well short of being some evidence that Taylor acted in a way that created a reasonable apprehension of danger to Duke.  Simply put, there was not sufficient evidence to support an

instruction on the defense of others, and the trial court did not err by refusing to give Felton's proposed instruction.

II. LFOs

Felton argues that the VPA and DNA collection fee should be stricken from his judgment and sentence because they are no longer authorized by the legislature. We agree and remand to the trial court to strike the VPA and the DNA collection fee.

Effective July 1, 2023, the VPA is no longer authorized for indigent defendants. LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4). The legislature also removed authorization for the DNA collection fee. LAWS OF 2023, ch. 449 § 4; RCW 43.43.7541. And changes to the legislation governing LFOs apply to cases on direct appeal when the change was enacted. *State v. Matamua*, __ Wn. App. 2d __, 539 P.3d 28, 39 (2023).

Because the trial court found Felton indigent, the VPA is no longer authorized by statute. And the DNA collection fee is also no longer authorized by statute. Therefore, the VPA and DNA collection fee should be stricken from Felton's judgment and sentence.

CONCLUSION

We affirm Felton's conviction for second degree assault but remand to the trial court to strike the VPA and DNA collection fee from Felton's judgment and sentence.

No. 57813-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

VELJACIC, J.